Filed 5/30/13  P. v. Cortez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B233833 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA345971) |
| v. | |
| NORMA LILIAN CORTEZ et al., | |
| Defendants and Appellants. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Dennis J. Landin, Judge.  Affirmed as to Bernal; reversed as to Cortez.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Norma Lilian Cortez.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Rodrigo Alonso Bernal.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendants Norma Lilian Cortez and Rodrigo Alonso Bernal were charged by amended information with premeditated murder (Pen. Code, § 187, subd. (a); count 1)[1] and attempted premeditated murder (§§ 664/187, subd. (a); count 2). It was alleged that Bernal personally used a firearm, discharged a firearm, and discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b), (c), (d); counts 1 & 2). As to both Cortez and Bernal, it was alleged that a principal personally used a firearm, discharged a firearm, and discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b), (c), (d), (e)(1); counts 1 & 2). The information also included gang allegations (§ 186.22, subd. (b)(1)(C), (4)). The defendants were found guilty by the jury, and all special allegations were found to be true. They were each sentenced to an aggregate term of 50 years to life.

On appeal, Cortez contends her attorney provided her with ineffective assistance of counsel by failing to object to the admission of evidence of the meaning of her tattoo; the prosecutor lowered its burden of proof by misrepresenting the beyond a reasonable doubt standard of proof; the trial court erroneously instructed the jury with CALCRIM No. 361; the admission of Bernal's out-of-court statements to his nephew violated her right to confront and cross-examine witnesses, and was error under Evidence Code sections 1230 and 352; the trial court failed to instruct the jury to view Bernal's out-of-court statements with caution; cumulative error; and that the trial court applied the wrong legal standard in ruling on her motion for a new trial.

Bernal contends the trial court erred by refusing to instruct on self-defense, imperfect self-defense, and provocation for both second degree murder and voluntary manslaughter. Appellants each join in the other's arguments that may inure to their benefit.

---

[1]     All undesignated statutory references are to the Penal Code, unless otherwise indicated.

Finding merit in Cortez's contentions regarding prosecutorial conduct, CALCRIM No. 361, Evidence Code section 1230, and cumulative error, we reverse her conviction on these grounds. We affirm as to Bernal.

**FACTS**

On September 3, 2008, childhood friends Miguel Guzman, 16 years old, and Emanuel Z., 19 years old, lived in the neighborhood near the intersection of 5th and Bonnie Brae Streets in Los Angeles. There was a lot of 18th Street gang graffiti in the area, and gang members frequented the neighborhood. Guzman and Emanuel were not gang members. As they were crossing 5th Street near the corner of Bonnie Brae Street, Emanuel heard a woman ask, "Where you guys from?" Emanuel saw a car driven by Cortez, with Bernal in the passenger seat, and a male in the back seat. The driver's window was down. Guzman and Emanuel did not respond and kept walking.

Emanuel heard the same woman's voice say, "Let them have it." He saw the car driven by Cortez stop. Guzman asked Emanuel, "Are they going to shoot or no[?]" Bernal got out of the car. He pulled a dark-colored gun from his waist, put his left hand on top of the car, and started shooting across the roof of the car at Guzman and Emanuel. Emanuel ran as soon as he saw the gun. Guzman appeared startled and put up his hands. Bernal shot five or six times, killing Guzman. Guzman did not have a gun and no one shot back at Bernal.

Emanuel ran inside a building at 504 South Bonnie Brae Street. Guzman was behind him, but Emanuel did not know if Guzman made it to the building. When Emanuel went to the building's balcony, he saw Guzman on the pavement below, being tended to by paramedics. Emanuel tried to leave but police would not let anyone out of the building. He did not immediately speak with police because he was "shocked" and afraid to talk to police. He spoke with detectives about a week after the shooting, when they encountered him unexpectedly at Guzman's house while Emanuel was visiting with Guzman's family. Emanuel identified Bernal as the shooter from a six-pack photo array and during the preliminary hearing, but not at trial. He identified three women in a six-pack photo array as resembling Cortez.

3

David R. also lived in the neighborhood near 5th and Bonnie Brae Streets. He heard the sound of brakes slamming, and saw a light beige car driven by Cortez, with Bernal as a passenger, stop suddenly. He thought a child was in the back seat. He saw defendants yelling at Guzman, but could not tell what was being said because they were yelling over each other. Guzman may have responded "18th Street," but continued walking. Bernal got out of the car and pulled a gun from his waist and started shooting. Guzman put up his hands and looked scared. After the final gunshot, the beige car moved a couple of feet forward, and stopped when Bernal said, "Hold on, . . . hold on." Once Bernal got in the car, he said, "Let's go, let's go." The car drove south on Bonnie Brae Street. David called 911, giving the operator a partial license plate number, and then noticed Guzman lying on 5th Street, not moving or breathing. Police spoke to David on the day of the shooting as they went door to door canvassing the neighborhood.

Marvin B. also lived in the neighborhood. He was in his apartment when he heard a gunshot and, from his window, saw Bernal standing next to a parked car and firing shots. He heard more shots and saw Bernal chase someone across the street. He heard more gunshots after Bernal left his line of sight. Marvin walked outside and saw defendants' car on 6th Street, turning right on Alvarado Street. He saw the female driver's face. He spoke with police at the scene shortly after the shooting and provided a description of Cortez to police. That same day, he identified Cortez in a field showup.

Los Angeles Police Officer Javier Ramirez responded to the scene at 4:15 p.m. Guzman was bleeding from his mouth and not breathing. Because the shooting happened in 18th Street gang territory, responding officers drove to rival gang Rockwood's nearby turf. They saw a car matching the description and license plate of the suspect, double-parked in the middle of the street in front of 401 Witmer Street, with its hazard lights on. Cortez was in the driver's seat and was taken into custody. A live round was found on the passenger side of the car, of the same caliber and brand of several found at the scene of the shooting.

Cortez was interviewed by police on the evening of September 3, 2008. A recording of the interview was played for the jury. She said that on the day of the

4

shooting, Bernal asked for a ride to pick up some money. They stopped and picked up a friend of Bernal's, who was "very young" and dressed in "gangster attire." Bernal sat in the front passenger seat, and his friend sat in the back. Bernal instructed her to "just drive around." He then told her to stop at 3rd and Bonnie Brae Streets so he and his friend could get out, and to keep on driving as they would catch up with her. As she was driving, she heard some gunshots from two blocks away at 5th and Bonnie Brae Streets. Bernal and his friend then got back in her car. She did not know what had happened, and she did not ask them about the gunshots. She drove to where she was ultimately arrested, where Bernal and his friend got out of her car and told her to wait. Cortez had known Bernal for about a year. They were friends, even though she was in her 40's and he was in his 20's. She did not believe Bernal was a gang member, but he did associate with the Rockwood gang. She admitted that Bernal had a gun that he "always carries."

Later in the interview, Cortez changed her story, admitting her previous story was not true. She said that before the shooting, she heard Bernal yelling "Where you from?" to two young men whom Cortez believed to be gang members. They responded, "18th Street." Bernal yelled, "Rockwood." Cortez told Bernal to "[l]et it go." But Bernal jumped out of the car, and then she heard gunshots. The back-seat passenger did not get out of the car. Cortez kept driving, but did not get far because of traffic. Bernal ran and jumped back in the car. She started to "cuss[] him out." He said nothing to her except, "drive." She kept driving, and she was scared. Bernal told her to stop, and she parked and put on her hazard lights. Bernal and his friend took off to stash the gun.

Detective John Motto investigated the shooting. He testified that six bullet casings, and one expended bullet, were found at the scene. There were casings found on Bonnie Brae and 5th Streets. They were all nine-millimeter. It could not be determined where the shooter was standing from the casings alone because they can discharge from the gun in different directions, and could roll downhill to a different location. The casings were from two different brands of bullets. However, it was common for officers to find casings from multiple manufacturers at one crime scene that were discharged from the same gun.

5

On September 4, 2008, police interviewed Bernal's 17-year-old nephew, Oscar Tejeda. Tejeda's taped interview was played for the jury. The interviewing officer falsely told Tejeda that Bernal had confessed to the shooting. Tejeda told the officer that Bernal was a member of the Rockwood gang and goes by the moniker "Scooby." Tejeda had seen Cortez socializing with Bernal and other members of the Rockwood gang. According to Tejeda, Bernal stopped by his apartment on September 3 to drop off some marijuana that he did not want to get caught with. While at the apartment, Bernal told Tejeda "he went shooting with some -- somebody at some woman I think." He said "he went with some lady to go shoot somebody." Bernal said "[h]e was shooting." Bernal told Tejeda "yesterday we went and we shot at two 18s." He said the "driver was a girl." Tejeda could not remember the female's name, but knew that she lived in his apartment building, and he knew who she was. Tejeda believed she was dating another member of Rockwood.

When Detective Michael Arteaga asked Tejeda to tell him exactly what Bernal said, Tejeda responded, "I don't remember how he told me exactly . . . . He's like, we went, me and this woman, don't know her name, we went to -- we went shooting some 18s, like at some 18s." Bernal did not tell Tejeda what he had done with the gun. Bernal told Tejeda he "shot two 18s." Bernal also said that police had caught Cortez in her car while she waited for him.

Tejeda identified Cortez from a six-pack photo array. Detective Arteaga asked whether Cortez's name was "Stephanie," "Sylvia," "Nancy," "Mickey," "Martha," or "Norma." Tejeda said he believed her name is Norma, which is in fact Cortez's first name.

At trial, Tejeda testified that police came to his house with their guns drawn and handcuffed him and his sister. Some hours later police asked him for a gun and said that if he did not hand it over, he would be arrested for aiding a murder suspect. Tejeda told police he did not know what they were talking about. He was scared. Police took Tejeda to the station. At the station, he lied to police about what Bernal had told him. In fact, Bernal did not say anything about a shooting. Tejeda felt pressured by the police to lie.

6

Tejeda did testify that Bernal was a member of the Rockwood gang. He admitted that the detective who interviewed him was friendly and polite. He also admitted that he had seen Cortez and Bernal socializing before with members of the Rockwood gang.

Gang expert Antonio Hernandez testified that the Rockwood and 18th Street gangs are enemies and occupy adjacent territories. Gang members would not casually enter the territory of a rival gang. Bernal was a member of Rockwood, with the monikers "Scooby" or "Woody." The primary activities of the Rockwood gang are robberies, assaults, extortion, criminal threats, felony vandalisms and narcotics sales. Hernandez did not know Cortez to be a member of the Rockwood gang.

Cortez has a triangular, three-dot tattoo on her arm. According to Hernandez, both gang members and nongang members may have this tattoo. However, it is a common tattoo for gang members and associates. The tattoo signifies the "crazy life," suggesting that its bearer is living a life of doing drugs, drinking, and committing crimes. Victim Guzman also had such a tattoo. Hernandez did not believe that Cortez and Guzman were gang members. However, someone is a gang associate if they hang out with gang members, but have not been formally admitted into the gang. Hernandez did not believe Emanuel was a gang member either.

When a gang member asks, "Where are you from," it is a challenge, intended to initiate a confrontation. Based on a hypothetical mirroring the facts of this case, Hernandez believed the shooting was for the benefit of the Rockwell gang.

While Bernal was in jail, he tried to send a letter to a Rockwell gang member, Jose Birrueta. In the letter, Bernal told Birrueta Cortez's full name and booking number, and asked if he "could go and see her at Lynwood jail and talk to her to see what she's saying with me or against me. If she's against me write to me and let me know what's up so I can make a game plan. If she's with me let me know what she's saying and tell her to change her story because they don't have anything on both of us to say that I wasn't with her that day to let me go. She's the only one holding me back so when I get out I could help her with a lawyer." Bernal asked Birrueta to "convince her to say I was not with her, that they scare her, the police did, and she was just nervous and she just confused."

7

Bernal also wrote "here's the name of the other fool who's snitching me out. Emanuel Z[.] [¶] . . . [¶] My nephew talked to him to say the police scare him and threatened him. So when the detectives came he said what he say, so to say different. He was scared, but it was a lie, what he said when he gets to court. My sister's kid."

Cortez testified in her own defense. She was not a member of a gang, and was not involved in any kind of gang mission on the day of the shooting. Bernal asked her for a ride so he could pick up some money he had loaned to someone. Cortez told him she would need gas money if she gave him a ride, and he agreed. They started driving on 6th Street near Bonnie Brae and Alvarado Streets, and picked up Bernal's teenage friend, who got in the back seat. Bernal did not ask for permission to give his friend a ride, and Cortez did not ask why he got into the car. She figured he was Bernal's friend and he was probably in the car because he owed Bernal the money. She did not care and did not see anything wrong in the situation. Bernal told Cortez to continue driving, and he would direct her where to go.

As they neared the intersection of 5th and Bonnie Brae Streets, Cortez saw two young men in the street, yelling "18th Street" and making signs with their hands. No one in her car responded to the young men. However, Bernal jumped out of her still moving car without saying a word. Cortez saw one of the young men "reaching like a motion like to getting a gun." She was still driving, and then heard gunshots. Bernal then got back into the car and said, "let's go."

Bernal directed Cortez to another location. She stopped where Bernal told her to, and Bernal and his friend got out of the car. Cortez knew that something bad had happened but did not want to ask what because she was scared. She put on her hazard lights and waited for Bernal to return. She was a "bundle of nerves" and did not go home because she was not thinking. She was "frozen" and did not know what to do. The police arrived 10 minutes later, and she was arrested. She initially was not truthful with the police because she was scared.

Cortez believed Bernal to be a nice, helpful person, and she did not think he was a gang member. She met him when she moved into her apartment, and Bernal and some of

8

his friends offered to help her with her groceries. She testified that was "how we developed . . . a friendship." Their relationship was platonic. However, she admitted telling police that Bernal talked a lot about the Rockwood gang and was proud of it, and that she knew him to get in fights and carry a gun at all times. Cortez also admitted that she knew she lived in Rockwood gang territory, but later denied that there was gang activity in her neighborhood or the neighborhood where the shooting occurred.

Cortez's son, Steven McBride, knew Bernal and assumed he was a gang member. He had seen his mother and Bernal hang out together.

Cortez's ex-husband, Schuyler McBride, testified that when he first started dating Cortez, he "[did]n't believe she was a [gang] member," although she had friends who were gang members. They both socialized with gang members in their community. Because Cortez and McBride socialized with gang members, they had "street smarts about gangs," and knew "what gangs were all about." When asked whether it would surprise McBride to learn that Cortez was friends with Bernal, he responded, "No."

The pastor and a member of Cortez's church, New Hope Ministries, testified that Cortez attended Bible study and was involved in some of the church's outreach programs. According to pastor Troy Nakama, the ministry "is very unique because it reaches out to people that normally wouldn't attend churches. We target individuals that are struggling in life and such." The ministry runs a gang outreach program, including a men's rehabilitation. Pastor Nakama could not recall Cortez being involved in any of the ministry's outreach programs, but Susana Rodriguez, Cortez's friend and a member of her church, believed Cortez did some outreach work, although Cortez was not involved in gang outreach specifically.

Kimi Lent, a gang interventionist, testified that gangs are more prevalent in low income communities, and that people in such communities had fewer resources, and would rely on each other for transportation. In gang culture, a "mission" is a planned crime. Driveby shootings can be conducted as part of a mission. Gang members would not normally carry out a mission with a nongang member.

Bernal presented the testimony of Dr. Mitchell Eisen, a psychologist with expertise on eyewitness identifications and suggestibility, who opined that witness identifications when weapons are involved may be less reliable because witnesses tend to focus on the weapons rather than the suspect, and that police administering identification procedures may influence those identifications.

## DISCUSSION

Cortez and Bernal raise a number of claims of error on appeal. Cortez contends the prosecutor lowered the burden of proof by misrepresenting the beyond a reasonable doubt standard; the trial court erroneously instructed the jury with CALCRIM No. 361; and the admission of Bernal's out-of-court statements to his nephew violated her right to confront and cross-examine witnesses, and was error under Evidence Code section 1230. We find merit in these contentions and find the cumulative errors prejudiced her. We reverse her conviction on these grounds. For this reason, we need not address her remaining contentions, except to the extent they inure to Bernal's benefit and Bernal joins in them. Bernal, for his own part, contends the trial court erred by refusing to instruct on self-defense, imperfect self-defense, and provocation. We find no merit in Bernal's contention or Cortez's contentions as they apply to him. We therefore affirm his conviction.

### 1. Prosecutorial Misconduct in Rebuttal Argument

Cortez contends the prosecutor misrepresented the beyond a reasonable doubt standard of proof during his rebuttal argument when he said, "The court told you that proof beyond a reasonable doubt is not proof beyond all possible doubt or imaginary doubt. Basically, I submit to you what it means is you look at the evidence and you say, 'I believe I know what happened, and my belief is not imaginary. It's based in the evidence in front of me.' " We agree with Cortez that the prosecutor's statements constituted misconduct and were prejudicial.

"A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such unfairness as to make the resulting conviction a

10

denial of due process. [Citation.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1352-1353.) The prosecutor's improper conduct need not be intentional to constitute reversible error. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)

"It is improper for the prosecutor to misstate the law generally, and in particular, to attempt to lower the burden of proof." (*People v. Ellison*, *supra*, 196 Cal.App.4th at p. 1353.) "[W]hen the claim [of prosecutorial misconduct] focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) We reverse a defendant's conviction because of prosecutorial misconduct when "it is reasonably probable the result would have been more favorable to the defendant in the absence of the misconduct." (*People v. Ellison*, *supra*, at p. 1353.)

The prosecutor's remarks in the present case misrepresented the "beyond the reasonable doubt standard" and constituted a fundamental misstatement of the law. Proof beyond a reasonable doubt -- that is, "proof that leaves you with an abiding conviction that the charge is true" (CALCRIM No. 220) -- is a qualitatively different and higher standard than a "not imaginary" belief based on the evidence. Something so little as a strong suspicion may support the statement "I believe I know what happened based on the evidence in front of me," but it cannot be disputed that a conviction based on a mere belief (imaginary or otherwise) or strong suspicion does not comport with due process. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5 [beyond a reasonable doubt standard a requirement of due process].) A preponderance of the evidence may also support a nonimaginary belief, though that means only that the evidence on one side outweighs the evidence on the other side. (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567; CACI No. 200.) Clearly, it is a lower standard than proof beyond a reasonable doubt and is also insufficient to support a criminal conviction. (*People v. Gaytan* (1940) 38 Cal.App.2d 83, 87.) The prosecutor committed misconduct

11

when he misstated the reasonable doubt standard. (See, e.g., *People v. Ellison*, *supra*, 196 Cal.App.4th at p. 1353 [prosecutor committed misconduct by arguing to the jury that reasonable doubt standard required jury "to determine whether defendant's innocence was reasonable"]; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268 [prosecutor's use of puzzle analogy "convey[ed] an impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt" and constituted misconduct]; *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36 [prosecutor's argument that people apply reasonable doubt standard " 'every day' " and that it was same standard people used in deciding whether to change lanes trivialized the standard and was improper].)

Moreover, when viewed in context, there is a reasonable likelihood the jury construed the prosecutor's remarks in a fashion that lowered the People's burden of proof. It is true the court properly instructed the jurors on proof beyond a reasonable doubt and told them that if the attorneys' comments on the law conflict with the instructions, they must follow the instructions. And while we presume the jury followed the court's instructions, that presumption applies only absent a contrary showing in the record. (*People v. Burch* (2007) 148 Cal.App.4th 862, 869.) There is such a showing here. The court first gave the pertinent instructions, and then the parties proceeded to make their closing arguments. Cortez's counsel equated proof beyond a reasonable doubt with proof sufficient for a mother to convict her child. In rebuttal, the prosecutor argued that defense counsel's characterization of the standard was "ridiculous." He then invoked the court's instruction on reasonable doubt and purported to tell the jury what it meant. ("The court told you that proof beyond a reasonable doubt is not proof beyond all possible doubt or imaginary doubt. Basically, I submit to you what it means is you look at the evidence and you say, 'I believe I know what happened, and my belief is not imaginary.'") Defense counsel objected that the prosecutor had misstated the law, and the court overruled the objection without any further comment.

The jury observed a dispute over what the reasonable doubt standard meant. Defense counsel said one thing and the prosecutor said another. When defense counsel

12

objected to the prosecutor's statements, the court's ruling signaled to the jury that the prosecutor's description of the standard was unobjectionable. The court did not give a curative instruction, admonish the jury to follow the court's instructions, or read the reasonable doubt instruction after closing arguments. The jury went directly into deliberations with the court's implicit endorsement of the prosecutor's misstatement. Under these circumstances, it was reasonably likely the jury construed the prosecutor's misstatement of the burden of proof in an objectionable fashion.

These circumstances distinguish this case from those relied on by respondent. In *People v. Katzenberger*, *supra*, 178 Cal.App.4th at page 1268, and *People v. Nguyen*, *supra*, 40 Cal.App.4th at page 36, the courts determined the prosecutors' arguments misstating the burden of proof did not prejudice the defendants. In *People v. Katzenberger*, the jury was alerted to the dispute over the prosecutor's improper argument, and the court told the jury "it would 'clarify' the issue by reading the jury instruction on reasonable doubt." (*People v. Katzenberger*, at p. 1268.) In *People v. Nguyen*, the defendant did not object to the misstatement and the prosecutor directed the jury to read the reasonable doubt instruction, despite the misstatement. (*People v. Nguyen*, at p. 36.) In neither of these cases did the court implicitly endorse the prosecutor's misstatement to the degree it did here.

Bernal joined in Cortez's arguments (Cal. Rules of Court, rule 8.200(a)(5)), but we find no reversible error with regard to him. The evidence against Bernal was especially strong. He brought a gun along for the ride with Cortez, admitted to his cousin that he committed the shooting, made incriminating statements in his letter to a fellow gang member, and Emanuel identified him as the shooter.

## 2. CALCRIM No. 361

Cortez contends the trial court erred when it instructed the jury with CALCRIM No. 361. CALCRIM No. 361 provides: "If the defendant failed in (his/her) testimony to explain or deny evidence against (him/her), and if (he/she) could reasonably be expected to have done so based on what (he/she) knew, you may consider (his/her) failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to

13

prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." We review this assertion of instructional error de novo. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) Having done so, we are persuaded the trial court erred in this instance.

In order for the court to give this instruction, there must be facts or evidence in the prosecution's case within the defendant's knowledge that the defendant failed to explain or deny. (*People v. Lamer*, *supra*, 110 Cal.App.4th at p. 1469.) This instruction has been the target of some hostility. As one court has emphasized, "it should not even be requested by either side unless there is some specific and significant defense omission that the prosecution wishes to stress or the defense wishes to mitigate. In the typical case it will add nothing of substance to the store of knowledge possessed by a juror of average intelligence." (*People v. Haynes* (1983) 148 Cal.App.3d 1117, 1120.) Mere conflict between the defendant's testimony and that of prosecution witnesses is not a failure to explain or deny, nor is a failure to recall specific details. (*People v. Saddler* (1979) 24 Cal.3d 671, 682; *People v. Roehler* (1985) 167 Cal.App.3d 353, 393.) Neither one paves the way for giving this instruction. (*People v. Saddler, supra*, at p. 682; *People v. Roehler*, *supra*, at p. 393.) Moreover, "the test for giving the instruction is not whether the defendant's testimony is believable. [The instruction] is unwarranted when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear." (*People v. Kondor* (1988) 200 Cal.App.3d 52, 57; see also *People v. Lamer, supra*, 110 Cal.App.4th at p. 1469.)

Here, Cortez did not fail to explain or deny any fact or evidence within her personal knowledge. She generally explained her actions the day of the shooting. She explained why she gave Bernal a ride (to pick up some money), why she drove to the area of the shooting (she was following Bernal's directions), and why she waited for Bernal after the shooting (she was scared, nervous, and not thinking straight). Respondent is simply incorrect when it asserts that Cortez failed to explain a number of things within her knowledge. For instance, respondent argues Cortez did not explain a three-hour

14

discrepancy between the time she said the shooting occurred (approximately 1:00 p.m.) and the time prosecution witnesses said it occurred (approximately 4:00 p.m.). A conflict in the evidence does not equate to a failure to explain. (*People v. Saddler*, *supra*, 24 Cal.3d at p. 682.) Still, when confronted with the discrepancy on cross-examination, she explained it. She admitted that she was not "quite sure" the shooting occurred around 1:00 p.m., and it was probable she had been mistaken when she said that it occurred early in the day. Respondent also argues she did not explain whether she thought Bernal's friend was dressed like a gang member. But Cortez explained the friend's dress, and if there was any failure to explain, it was only because the prosecutor cut her off. The prosecutor asked if Bernal's friend was "dressed like a gangster"; Cortez responded that he was wearing a very loose shirt, "[t]he way kids dress now." The prosecutor slightly reworded the question to ask if Cortez *thought* he was dressed like a gangster, and she replied, "I see so many kids that dress like him." He then asked, "Are you just going to refuse to answer my question?" She responded, "No, because --," after which the prosecutor cut her off and asked another question. In yet another instance, respondent argues Cortez failed to explain why she did not stop the car to let Bernal in after the shooting. To the contrary, she explained she was not going to "stop and check" because gunfire had just occurred and she was scared. As a final example, respondent maintains she failed to explain how a live bullet ended up on the floorboard of her car. In fact, she testified she did not put the bullet there, she had no idea how it got there, and she did not know if it was there before Bernal got into the car because she did not check the car before then. Cortez explained that the bullet's presence was not within her personal knowledge. She need not have speculated how the bullet came to be there. (See *People v. Lamer*, *supra*, 110 Cal.App.4th at p. 1469 [instruction proper only when defendant fails to explain matters within his or her knowledge].)

Respondent further asserts that several of Cortez's statements were implausible and therefore justified the instruction. Whether respondent found her statements plausible is not the test, however. (*People v. Lamer*, *supra*, 110 Cal.App.4th at p. 1469.) The instruction should not have been given.

15

### 3. Confrontation Clause and Evidence Code Section 1230

Cortez contends that evidence of Bernal's statements to his nephew were inadmissible under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) because they were out-of-court statements implicating her, and she was not able to cross-examine Bernal, violating her rights under the Sixth Amendment confrontation clause.

The confrontation clause is violated only by the admission of *testimonial* hearsay statements, which the statements here were not. (*People v. Loy* (2011) 52 Cal.4th 46, 66.) In our recent decision in *People v. Arceo* (2011) 195 Cal.App.4th 556 (*Arceo*), we rejected the defendant's objection to statements as a violation of his Sixth Amendment confrontation rights. The defendant sought to exclude out-of-court statements by nontestifying codefendants that implicated him in the crimes. As Cortez does here, the defendant claimed the statements were inadmissible under *Bruton v. United States* (1968) 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d 518. We held the confrontation clause has no application to nontestimonial out-of-court statements by codefendants. (*Arceo*, at p. 571.) In *People v. Cervantes* (2004) 118 Cal.App.4th 162 (*Cervantes*), the court held that when it was not reasonably anticipated that a statement would be used at trial, the statement was not "testimonial" within the meaning of *Crawford*. (*Cervantes*, at p. 174.) When Bernal confided in his nephew, he did not speak with the belief that his statements would be used at trial. His statements to his nephew were casual remarks made to a family member, in the family home, and were not testimonial under *Crawford*. (*People v. Loy*, at pp. 66-67.)

Still, the California codified rules of evidence apply to nontestimonial statements. Bernal's statements were admissible against Cortez only if they fell within an exception to the hearsay rule and "otherwise satisfie[d] the constitutional requirement of trustworthiness." (*Cervantes*, *supra*, 118 Cal.App.4th at p. 177; see also *Arceo*, *supra*, 195 Cal.App.4th at pp. 573-574.) The trial court ruled that Bernal's remarks to his nephew were reliable and were admissible as declarations against penal interest. We disagree that Bernal's out-of-court statements were admissible against Cortez.

16

A trial court's admissibility ruling under Evidence Code section 1230 is reviewed on appeal for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 536 (*Brown*).)[2] "Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was against the declarant's penal interest. The proponent of such evidence must show 'that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 462.) Generally, this hearsay exception is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 442.) "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, *whether the declarant spoke from personal knowledge*, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 334, italics added.)

In the present case, Bernal's statements to the effect that he and a woman went to commit a shooting were not sufficiently trustworthy to be admitted against Cortez. Bernal apparently told his nephew this in several different statements. (E.g., "we went, me and this woman, don't know her name, we went to -- we went shooting some 18s, like at some 18s"; "yesterday we went and we shot at two 18s"; "he went with some lady to go shoot somebody.") The references to a woman or lady and the phrase "we went"

---

[2] Cortez contends that the proper standard of review is de novo. (See *Cervantes*, *supra*, 118 Cal.App.4th at p. 174 ["we conclude it is appropriate to conduct a de novo review of the totality of the circumstances that surround the making of the statement"].) However, we are bound to follow the Supreme Court's determination of the standard of review in *Brown* and find that the great weight of authority has employed the abuse of discretion standard of review. (See *People v. Lawley* (2002) 27 Cal.4th 102, 153-154; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335-336 (*Greenberger*); *People v. Wilson* (1993) 17 Cal.App.4th 271, 276.)

necessarily implied that he *and Cortez* went to go shoot someone that day. The statements suggest Cortez knew of a plan to commit the shooting and went along with it. Indeed, the prosecutor argued to the jury that Bernal's statements were evidence Cortez knew of Bernal's purpose and had the intent to assist him. The prosecutor stated: "And when the nephew talked to the police about what his uncle told him, he repeatedly said that his uncle told him we went, we went and shot at some 18ths. That is how you know she had the knowledge of his purpose going there and she had the intent to assist him." However, Bernal could not speak from personal knowledge in describing Cortez's state of mind. His statements in that respect were speculation and hence not trustworthy. (*People v. Valencia* (2006) 146 Cal.App.4th 92, 103-104 ["In the absence of personal knowledge, a witness's testimony or a declarant's statement is no better than rank hearsay or, even worse, pure speculation."].) References to "we," a lady, or a woman could have easily been redacted from Bernal's statements, leaving other relevant portions that amounted to a confession on his part. For example, his statement that "he went with some lady to go shoot somebody" could have been redacted to say "he went . . . to go shoot somebody." We agree with the notion that his statements were admissible against him because they were against his penal interest, were made in a setting that promoted truthfulness (a discussion in the family home between close family members), and were trustworthy to the extent he reported on this own actions and thoughts. As against Cortez, though, they lacked a guarantee of trustworthiness, and they should not have been admitted without at least redacting the portions that specifically implicated her.

## 4. Cumulative Error

Cortez contends that even if no individual errors were prejudicial alone, the cumulative effect of multiple errors require reversal. When a defendant claims cumulative error the "test is whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.) "[W]e review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid.*) The cumulative effect of the errors discussed *ante* -- prosecutorial misconduct, instructing the

jury with CALCRIM No. 361, and the admission of Bernal's out-of-court statements against Cortez -- require reversal.

The case against Cortez was close and not particularly strong. Her conviction was based on aiding and abetting liability. Cortez admitted that she drove Bernal around the afternoon of the shooting and was present when the shooting occurred. There was no real dispute about her conduct on the day of the shooting. But the People had to also prove that Cortez *knew* Bernal intended to commit murder and she *intended* to aid and abet him in that crime. (CALCRIM No. 401.) Thus, the primary issue with which the jury had to grapple was whether she had the requisite knowledge and intent.

On the one hand, Emanuel testified he heard a woman say, "Where you guys from?" and "Let them have it," right before the shooting. On the other hand, Cortez's testimony suggested that she did not have knowledge of Bernal's purposes or intend to aid him in committing a crime. She testified that she was not a gang member and was not involved in any kind of gang mission on the day of the shooting. She drove Bernal because he asked for a ride to pick up some money, and in exchange he was to give her gas money. She said Bernal jumped out of her moving car without announcing what he was doing, she heard gunshots, and then he got back into the car. She knew something bad had happened but did not want to ask questions because she was scared. While her out-of-court statements to police were not entirely consistent with her trial testimony, she was consistent that she believed she was giving Bernal a ride to pick up money and did not seem to know of any plan to commit a shooting. Her pastor and church friend testified that she attended Bible study and was involved in the ministry's outreach programs. In short, only circumstantial evidence supported Cortez's knowledge of Bernal's purpose and intent to aid him, and her testimony was direct evidence to the contrary.

The jury likely understood a nonimaginary belief in Cortez's guilt was sufficient to convict her, given the prosecutor's misstatement lowering the People's burden of proof. CALCRIM No. 361 suggested to the jury that Cortez might have failed to explain or deny evidence against her and invited the jury to draw a negative inference on that

19

basis, even though there was no such failure on her part. And the admission of Bernal's speculative and untrustworthy statements to his nephew about Cortez's state of mind permitted the prosecutor to in turn speculate about Cortez's knowledge and intent. The prosecutor's argument suggested these statements were the best evidence of her knowledge and intent. In a close case against Cortez, it is reasonably probable that misadvising the jury on the burden of proof, calling attention to a negative inference that has no applicability, and admitting untrustworthy statements as to Cortez combined to tip the balance against her. We must reverse Cortez's conviction on this basis.

**5. Self-defense**

Bernal contends the trial court erred when it denied his counsel's request for instructions on self-defense, imperfect self-defense, and provocation (for both second degree murder and voluntary manslaughter). At trial, defense counsel contended the evidence warranted the instructions because the victims may have initiated a gang confrontation by "throwing gang signs [and] yelling," and because there were shell casings scattered about, implying that the victims may have been shooting as well. The trial court concluded that its role was to determine "whether there was evidence which, if believed by the jury, is sufficient to raise a reasonable doubt. [¶] And frankly, based on the state of the evidence, I don't see that in this case." We agree with the trial court here.

A trial court must instruct on an asserted defense, including self-defense, if there is sufficient evidence from which a reasonable juror could find the defense applicable. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1046; *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) When the trial court refuses a proposed instruction for lack of evidence, we review the record de novo to determine whether the record contains substantial evidence to warrant the instruction. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584; *People v. Cruz* (2008) 44 Cal.4th 636, 664.) Substantial evidence is " ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' " that the particular facts underlying the instruction did exist. (*Cruz*, at p. 664; see also *People v. Wilson* (2008) 43 Cal.4th 1, 16.)

20

Self-defense requires that a defendant actually and reasonably believes in the need to defend against imminent bodily injury or death. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1081; *Breverman*, *supra*, 19 Cal.4th at p. 154; see also §§ 197 [homicide justified when killing is accomplished in defense of self or others], 198 [circumstances excusing homicide must be "sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone"].) A jury must consider what " 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' " (*Humphrey*, at pp. 1082-1083.) If the defendant acts under the subjective but objectively unreasonable belief he or she is in imminent danger of great bodily injury or death, the killing is considered to have resulted from "imperfect self-defense." That is, the defendant " 'is deemed to have acted without malice and cannot be convicted of murder,' " but can be convicted of the lesser-included offense of voluntary manslaughter. (*Id.* at p. 1082; see also *People v. Randle* (2005) 35 Cal.4th 987, 994 ["Imperfect self-defense mitigates, rather than justifies, homicide; it does so by negating the element of malice."], overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201; *People v. Wilson*, *supra*, 43 Cal.4th at p. 16.) Neither the self-defense nor imperfect self-defense doctrines may be invoked by a "a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)

The trial court properly refused both instructions because the evidence was too insubstantial to support either defense theory. (See *People v. Strozier* (1993) 20 Cal.App.4th 55, 63.) First, the evidence showed Bernal provoked the confrontation between his group and the victims. Bernal drove into rival gang territory and yelled "Where are you from?" to the victims, a known gang confrontation. It is irrelevant that shell casings of different brands were found near the shooting, because there was no evidence that the victims fired a gun. To draw an inference that the victims were

21

shooting is pure speculation. (*People v. Valdez* (2004) 32 Cal.4th 73, 116 [speculation is insufficient to warrant an instruction; the evidence must be substantial].)

Second, there was no evidence, direct or circumstantial, that showed that Bernal "*actually . . .* believed he was in imminent danger of death or great bodily injury." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 771; see *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [defendant claiming self-defense must " ' "prove his own frame of mind" ' "].) According to Cortez, Bernal was calm both before and after the shooting, and was focused on avoiding capture, directing Cortez to drive to a specific location after the shooting. There was no evidence that he was shaken by the encounter with the victims. Therefore, we find that no substantial evidence warranted instructions on self-defense or imperfect self-defense.

Bernal also contends the trial court should have given provocation instructions. Provocation operates in two ways. First, it can reduce first degree murder to second degree murder if the defendant formed the intent to kill in direct response to provocation and acted immediately without deliberation or premeditation. Second, it can reduce murder to manslaughter if the defendant was subjectively provoked to kill, and a person of average disposition (an "objective" person) would have been provoked to kill. Provocation to reduce a killing to second degree murder is a purely subjective inquiry whereas provocation in the context of voluntary manslaughter contains both a subjective and objective element. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.)

We first examine provocation sufficient to reduce a murder to voluntary manslaughter. "Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter -- a lesser included offense of murder." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Heat of passion will also reduce attempted murder to attempted voluntary manslaughter. (*People v. Williams* (1988) 199 Cal.App.3d 469, 475.) Heat of passion has both objective and subjective components. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) The defendant must subjectively act in the heat of passion. (*Ibid.*) But the claimed provocation must be

22

sufficient to cause a reasonable person under the same circumstances to act rashly, without deliberation and reflection, from passion rather than from judgment. (*Carasi*, at p. 1306.) The provocation must be such that a "reasonable person in defendant's position would have reacted with homicidal rage." (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1086.) A defendant may not " ' "set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused . . . ." ' " (*Cole*, at p. 1216.)

Here, there was no evidence of legally sufficient provocation to warrant a voluntary manslaughter instruction. Notwithstanding the evidence that the victims and Bernal may have engaged in "where are you from" gang banter, and gang members are prone to violent overreactions, an ordinary person does not become homicidally enraged when another person claims an affiliation with a rival "organization." Requiring the instruction would effectively adopt a "reasonable gang member" standard, which is clearly not the law.

We next examine provocation sufficient to reduce deliberate and premeditated first degree murder to second degree murder (when the evidence is not sufficient to reduce the crime to involuntary manslaughter). If the jury finds that the defendant "formed the intent to kill as a direct response to . . . provocation and . . . acted immediately" without deliberation or premeditation, the offense is reduced to second degree murder. (*People v. Wickersham* (1982) 32 Cal.3d 307, 329 (*Wickersham*), disapproved on another ground by *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) Provocation sufficient to mitigate a murder to second degree murder requires only a finding that the defendant's subjective mental state was such that he did not deliberate and premeditate before deciding to kill. (*People v. Fitzpatrick*, *supra*, 2 Cal.App.4th at pp. 1295-1296.)

Here, there was overwhelming evidence that Bernal harbored the intent to kill before any exchange between him and his victims. Although there was some evidence of an exchange of gang challenges between Bernal and his victims (see *Wickersham*, *supra*, 32 Cal.3d at p. 329 [the fact that heated words were exchanged between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing in advance]), there is no

evidence that this exchange provoked Bernal to kill Guzman and attempt to kill Emanuel. (*People v. Johnson* (1993) 6 Cal.4th 1, 42-43 [provocation instruction only warranted if defendant formed the intent to kill as a *direct* response to such provocation and acted *immediately* to carry it out].) Bernal went into rival gang territory with a gun, and initiated a confrontation with supposed rival gang members. It is clear from this evidence that he had formed his intent to kill before any provocation by his victims.

Moreover, there is no reasonable probability that Bernal would have received a more favorable outcome if the instruction had been given. (See *Breverman*, *supra*, 19 Cal.4th at p. 165; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Provocation causes the defendant to act rashly, impulsively or without careful consideration. The jury here was instructed with CALCRIM No. 521, which explains the degrees of murder. That instruction tells the jury that a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Thus, the jury was aware that if Bernal acted rashly or impulsively, he was guilty of only second degree murder. Nevertheless, the jury convicted Bernal of first degree murder, showing they did not believe he acted rashly or impulsively. (*People v. Chatman* (2006) 38 Cal.4th 344, 392 [error in failing to give lesser included offense instruction is harmless when jury necessarily decides the factual question posed by the omitted instructions adversely to defendant under other properly given instructions].)

## 6. Accomplice Testimony

Cortez contends the trial court should have instructed the jury, sua sponte, to view Bernal's comments to Tejeda with caution, as set forth in CALCRIM No. 334. We need not address this argument as to Cortez, having already determined that other errors prejudiced her. Still, Bernal joins in this argument (Cal. Rules of Court, rule 8.200(a)(5)). He did not provide any individualized analysis about how Cortez's testimony (or which testimony) tended to incriminate him. Therefore, any claim of error was waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [a brief must contain reasoned argument and legal authority to support its contentions or the court may treat the

24

claim as waived].)  In any event, as discussed *ante*, the case against him was much stronger than the case against Cortez, and any error was necessarily harmless.

## DISPOSITION

The judgment against Cortez is reversed.  The judgment against Bernal is affirmed.


FLIER, J.

I CONCUR:


RUBIN, Acting P. J.

25

**GRIMES, J., Concurring and dissenting.**

I concur in the affirmance of the judgment of conviction of defendant Rodrigo Bernal. However, I respectfully disagree with my colleagues' conclusion that defendant Norma L. Cortez's conviction must be reversed.

**1.      Prosecutorial Misconduct**

I do not find the prosecutor's statements during his rebuttal, when viewed in context, amount to prosecutorial misconduct. After correctly stating "proof beyond a reasonable doubt is not proof beyond all possible doubt or imaginary doubt," the prosecutor exhorted the jury to consider the evidence when he then argued, "I submit to you what it means is you look at the evidence and you say, 'I believe I know what happened, and my belief is not imaginary. It's based in the evidence in front of me.' " This comment did not lower the burden of proof; it emphasized *imaginary* doubt is not *reasonable* doubt, and such a characterization of the burden of proof is a correct statement of the law. (See CALCRIM No. 220.)

I am not persuaded there is a reasonable possibility the jury construed the prosecutor's comments to permit conviction despite reasonable doubts. The court properly instructed the jury on the correct standard of proof. The jury was instructed that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." The jury was also instructed that "[y]ou must follow the law as I explain it to you . . . . If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." We presume the jury followed the court's instructions absent evidence to the contrary. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 37.)

The conclusion the trial court "implicitly endorse[d]" the prosecutor's statement of the law by overruling defendant's objection is unwarranted. The prosecutor made the challenged statement only after defense counsel equated proof beyond a reasonable doubt with proof sufficient for a mother to convict her own son. Given these conflicting

statements of the standard, the jury likely discounted counsels' comments as argument, and followed the trial court's instructions.

## 2. CALCRIM No. 361

My colleagues conclude Cortez did not fail to explain or deny the evidence against her. I disagree, finding Cortez failed to explain or deny a considerable body of evidence against her. Cortez failed to plausibly explain the peculiar circumstance that, as an innocent church-going woman, she agreed to take a man half her age, whom she had known only a year, and who she knew associated with the Rockwood gang and *always carried a gun*, "for a ride to pick up some money"; then permitted an unfamiliar teenage friend of his dressed in gang attire to get in the car without anything being said about why he was there; then, instead of going directly to a location where the money was to be paid, she took directions from Bernal where to drive without knowing the destination; and finally, why she drove Bernal and his friend away from the scene of the shooting and waited for them to stash the gun and come back and get in her car.

She failed to explain why she did not think it strange that Bernal invited his teenage friend to get into her car without telling her why he was joining them; why she permitted him to get in the car; and why, as a mature woman, she took orders from a young associate of the Rockwood gang. Respondent points out Cortez implausibly testified Bernal got out of her car two blocks away from the shooting, shot the victim multiple times, then got back into her car, all without her ever stopping her car; if that were the case, how was Marvin B. able to note her license plate and identify her in a lineup as the driver of the car from two blocks away? She also failed to plausibly explain why she waited for Bernal after the shooting, stating first she was scared, and then "I don't think I did anything wrong. I was giving somebody a ride."

My colleagues conclude Cortez's weak and implausible explanations for the evidence against her do not warrant the instruction, because plausibility "is not the test." (Maj. opn. *ante*, at p. 16.) However, at least two cases have found plausibility *is* a proper consideration in giving the instruction. (See *People v. Mask* (1986) 188 Cal.App.3d 450, 455 [the instruction is warranted "if the defendant tenders an

2

explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible"]; *People v. Roehler* (1985) 167 Cal.App.3d 353, 392-393.) Cortez's credibility was directly at issue, and the instruction correctly informed the jury that in assessing the reliability of her testimony, they could consider whether it was significant that she gave vague and implausible answers to obvious questions. (See CALCRIM No. 361.)

**3.     Evidence Code Section 1230**

My colleagues agree that because Bernal's statements to his nephew were not testimonial, they did not violate the confrontation clause and were therefore admissible so long as they fell within an exception to the hearsay rule. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571, 573-574.)

Generally, the hearsay exception for the admission of statements against penal interest is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441; see also *People v. Duarte* (2000) 24 Cal.4th 603, 612 ["Under the rule of *Leach*, a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' "].) However, a statement that inculpates the declarant and other individuals need not be excluded so long as the statement is not exculpatory, self-serving, or collateral. (*People v. Samuels* (2005) 36 Cal.4th 96, 120 (*Samuels*).) In *Samuels*, the defendant asked James Bernstein to murder her husband, and once Bernstein had done so, she solicited two other men to murder Bernstein. At the defendant's trial, a witness testified Bernstein told him, " 'He had done it and Mike . . . had helped him. *And that* [*the defendant*] *had paid him*.' " (*Id*. at p. 120, italics added.) On appeal, the defendant contended the italicized portion of these remarks was an attempt to shift blame to her, and were therefore not statements against Bernstein's penal interest. (*Ibid*.)

The Supreme Court held the entire statement was properly admitted as a declaration against penal interest, notwithstanding the reference to the defendant,

3

because the "admission, volunteered to an acquaintance, was specifically disserving to Bernstein's interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to [the] defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of Bernstein's precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Samuels*, *supra*, 36 Cal.4th at p. 121.)

Here, Bernal's remarks were made in a private conversation between Bernal and his younger nephew, Oscar Tejeda, the day after the shooting. Bernal told Tejeda he "went with some lady to go shoot somebody." Bernal admitted he did the shooting. Bernal further told Tejeda "yesterday we went and we shot at two 18s." Bernal said the "driver was a girl." Viewed in context, it is clear Bernal's statements are in no way exculpatory, self-serving, or collateral. He admitted he was the one who pulled the trigger. Like *Samuels*, to the extent the remarks discuss Cortez's involvement in the shooting, these remarks were not collateral, and were in fact quite damaging to Bernal because they implied he and Cortez together set out to commit a driveby shooting, which is probative of premeditation and the existence of a conspiracy to commit murder. (*Samuels*, *supra*, 36 Cal.4th at p. 121; see also *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176-177.)

Cortez's reliance on *Lawley* is misplaced. In that case, the defendant contended the trial court's *exclusion* of evidence of an out-of-court statement was an abuse of discretion. The trial court admitted, as a declaration against penal interest, the declarant's statement that he was hired and paid to kill the victim (implying defendant did not commit the killing), but did not admit a statement by the declarant that it was the Aryan Brotherhood that paid him to commit the killing, finding the latter statement was not against the declarant's penal interest. The court concluded that "nothing about *who* hired Seabourn to kill Stewart made Seabourn more culpable than did the other portions of his statement. Defendant argues the excluded portion of the statement would have

4

specifically inculpated Seabourn in the additional crime of conspiracy with the Aryan Brotherhood, but the argument fails to recognize that *any* murder for hire partakes of the elements of conspiracy; thus, Seabourn's naming of the Aryan Brotherhood was not specifically disserving of his interests." (*People v. Lawley* (2002) 27 Cal.4th 102, 154 (*Lawley*).)

*Lawley* addressed a different aspect of the declaration against penal interest exception to the hearsay rule, finding the trial court had not abused its discretion in *refusing* to admit statements that did not further inculpate the declarant. I find the trial court here did not abuse its discretion in concluding all of Bernal's statements inculpated him, because his statements about Cortez implied premeditation and a conspiracy to commit murder, whereas Bernal's statements about his conduct alone did not fully convey the scope of the crime.

My colleagues find Bernal's statements were not sufficiently trustworthy to be admissible against Cortez as a statement against penal interest. As the majority noted, "[t]here is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.) Although Tejeda provided various words and phrases to describe what Bernal said to him, and said he could not remember the precise words Bernal used, the gist of all the statements was Bernal and Cortez went together into rival gang territory to shoot someone, Bernal did the shooting, and Cortez did the driving.

The record does not suggest any motive for Bernal to lie about Cortez's participation in the shooting when Bernal confided in a trusted family member. Moreover, Bernal's statement "we went" to shoot someone is not untrustworthy speculation about Cortez's state of mind. Although his statement supports an inference as to Cortez's intent, nothing in this statement purports to explain what she was *actually*

5

*thinking*.  Rather, he explained what they *did*, when other evidence in the record amply supported the inference that Cortez knew of Bernal's objective before setting out with him.  Accordingly, there is nothing speculative about Bernal's statement.  Therefore, I find the trial court's conclusion that the statements were trustworthy was not an abuse of discretion.  (See *People v. Brown* (2003) 31 Cal.4th 518, 536.)

The trial court also did not abuse its discretion under Evidence Code section 352 when it admitted the statements.  Section 352 vests the court with discretion to exclude evidence, where the probative value of the evidence is outweighed by the probability that its admission will necessitate undue consumption of time, pose a substantial danger of undue prejudice or confusion of the issues, or mislead the jury.  A trial court's ruling to admit or exclude evidence under section 352 is reviewed for abuse of discretion. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.)

In this case, the trial court reasonably concluded the evidence was not unduly prejudicial, and was probative of Cortez's active participation in the crimes.  Although it was certainly damaging to Cortez, the evidence corroborated other evidence that already pointed to Cortez's guilt, such as eyewitness testimony that they saw her driving and heard her say "Where you guys from?" and "Let them have it."  We should not interfere with the trial court's discretion unless it was clearly abused.  (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65-66.)

Because the majority found reversible prejudicial error due to prosecutorial misconduct, instructing the jury with CALCRIM No. 361, and the admission of Bernal's statements to his nephew, the majority found it unnecessary to discuss the other purported errors asserted by Cortez, to which I turn now.

**4.	Accomplice Testimony**

Cortez contends the trial court should have instructed the jury, sua sponte, to view Bernal's comments to Tejeda with caution, as set forth in CALCRIM No. 334.  A trial court should give CALCRIM No. 334 when an accomplice testifies, and that testimony tends to incriminate the defendant.  (*People v. Howard* (2008) 42 Cal.4th 1000, 1021-1022; *People v. Guiuan* (1998) 18 Cal.4th 558, 569.)  The instruction

informs the jury an accomplice's testimony must be viewed with caution, and the jury may not convict a defendant on the accomplice's testimony alone. Rather, the accomplice's testimony must be corroborated by independent supporting evidence. (See CALCRIM No. 334.)

An accomplice's testimony may include " 'all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances.' " (*People v. Williams* (1997) 16 Cal.4th 153, 245; see also *Lawley*, *supra*, 27 Cal.4th at p. 160.) Statements are not "suspect" when they are trustworthy and reliable, such as when they fall within an exception to the hearsay rule. (*People v. Jeffery* (1995) 37 Cal.App.4th 209, 218.)

As discussed *ante*, Bernal's statements to his nephew were not testimonial, and fell within the hearsay exception for statements against penal interest. Accordingly, I conclude the trial court had no obligation to give an accomplice testimony instruction.

**5.     Ineffective Assistance of Counsel**

Cortez contends she received ineffective assistance of counsel when her attorney failed to object to the admission of evidence of the meaning of her "three dots" tattoo. She claims the evidence was inadmissible character evidence of her supposed propensity to do drugs and live a life of crime. "Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has a right to the assistance of counsel. [Citations.] This right 'entitles the defendant not to some bare assistance but rather to *effective* assistance.' [Citation.]" (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 466.) In order to demonstrate ineffective assistance of counsel, Cortez must show that counsel's performance fell below an objective standard of reasonableness, *and* that she was prejudiced by counsel's performance. (*Id*. at p. 467.)

At trial, gang expert Antonio Hernandez was questioned about the meaning of the three dots tattoo. When asked "[w]hat does that [tattoo] mean within [gang] culture?" he testified that the tattoo signifies the "crazy life," meaning that its bearer is

7

living a life of drugs, drinking, and crime. He denied the tattoo "necessarily mean[s] they are a gang member." However, he testified it is a common tattoo for gang members and associates. Someone is a gang associate if they hang out with gang members, but have not been formally admitted into the gang.

When the prosecutor sought to admit an exhibit displaying Cortez's tattoos (the three dots tattoo among others), defense counsel asked for an offer of proof. The prosecutor responded the tattoos showed Cortez had "a relationship with the gang culture," and the evidence was offered in anticipation of her defense that she was innocently caught up in the shooting and was not a gang member. The prosecutor sought to introduce evidence that Cortez "is getting tattoos that identify with that culture." Defense counsel stated, "I didn't object to the 'my crazy life' triple-dot tattoo because I know there's some gang relation, but the other tattoos my client has is 'Cortez' on her back with some rose thorns underneath it . . . . The other one is a tribal band on her wrist. There's no indication that has anything to do with gang culture."

Evidence Code section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." However, section 1101, subdivision (b) permits admission of such evidence when it is relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. It is well settled that gang evidence is highly probative of intent and motive. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 277.)

Cortez contends the evidence was not gang evidence, and was merely evidence of her propensity to live a life of crime and drugs. She has construed Hernandez's testimony too narrowly. Hernandez testified that Cortez's tattoo is common among gang members *and associates*. While he also opined Cortez was not a gang member, his testimony—coupled with the other evidence adduced at trial—clearly demonstrated that Cortez associated with gang members. This association belies her claimed "surprise" that Bernal started shooting in rival gang territory, and is therefore probative of her intent.

Because the evidence was clearly admissible, any objection would have been meritless, and Cortez cannot demonstrate prejudice. Moreover, she cannot demonstrate prejudice because there is no reasonable probability Cortez would have gotten a better result without the tattoo evidence, given the strong evidence of her guilt. (*People v. Walker* (2006) 139 Cal.App.4th 782, 808.) Witnesses saw her driving, and heard her yelling gang challenges. She also knew Bernal always carried a gun.

**6.  New Trial Motion**

After the verdicts, Cortez moved for a new trial under Penal Code section 1181, subdivision 6, reasoning there was insufficient evidence to support the verdict. She also raised other bases for the motion, which are not at issue on appeal. Specifically, she contended that the trial court improperly admitted Bernal's statements to his nephew (§ 1181, subd. 5), and that her due process rights were violated when the trial court limited the length of her closing argument. At the hearing on the motion, the trial court and the attorneys devoted significant time to discussing the admission of Bernal's out-of-court statements to his nephew, and discussed the sufficiency of the evidence issue only in passing. The trial court commented, "I do think there was sufficient evidence for a jury to make the decision in this case. Unfortunately, for Ms. Cortez, the jurors chose to believe the people's witnesses regarding what she did and what she said at the time of the shooting." The court denied the motion. Apparently acceding the sufficiency of the evidence, defense counsel stated, "In regards to the sufficiency of the evidence, the court was present." The court responded, "Sure." This was the extent of the discussion by counsel and the court.

Cortez contends the trial court abused its discretion because it applied the wrong legal standard, and accordingly failed to independently review the evidence. Under Penal Code section 1181, subdivision 6, a trial court may grant a new trial or modify the verdict to a lesser included offense when the verdict is "contrary to law or evidence." We review the trial court's denial of a motion for a new trial under the deferential abuse of discretion standard. An abuse of discretion occurs "if the trial court based its

9

decision on impermissible factors [citation] or on an incorrect legal standard [citations]." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

In determining whether to grant a motion for a new trial under Penal Code section 1181, subdivision 6, the trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) Unlike a ruling on a motion for acquittal under section 1118.1, where the trial court "evaluates the evidence in the light most favorable to the prosecution," the court extends "no evidentiary deference in ruling on a section 1181(6) motion for new trial." (*Porter*, *supra*, at pp. 132-133.)

Cortez interprets the court's comments as improper deference to the jury's verdict, and an abdication of its duty to independently review the evidence. However brief the court's comments were, it is clear the sufficiency of the evidence issue only merited a brief discussion, given the priority counsel placed on the other issues presented by the motion (such as Bernal's out-of-court statements). Cortez has taken the court's comments out of the larger context of the issues presented by the motion and attributed unwarranted meaning to them. Viewed in the proper perspective, it is obvious the trial court independently evaluated the evidence, and explicitly found the evidence was sufficient. When defense counsel alluded to the court being "present" for the trial to evaluate the sufficiency of the evidence, the court appeared to acknowledge its proper role as the 13th juror. The court's other comments about the jury are surplusage, and do not show the court used an incorrect legal standard. "Although it would have been preferable for the court to have been more specific, stating it was denying the motion based on its independent weighing of the evidence, its failure to do so and its use of less than artful language cannot be equated with having applied the wrong standard." (*People v. Price* (1992) 4 Cal.App.4th 1272, 1275 [finding the court did not apply the wrong legal standard when it stated " 'I think the evidence was sufficient, and I think that the jury—there was enough evidence there for the jury to do what the jury did . . .' "].) Therefore, I find no abuse of discretion.

10

### 7. Strength of the Case

Lastly, I disagree with my colleagues' view that "[t]he case against Cortez was close and not particularly strong" (Maj. opn. *ante*, at p. 20). In her testimony, Cortez admitted many of the essential facts supporting her conviction (that she was driving Bernal around, heard gunshots when he got out of the car, permitted him to get back in the car, and waited in the car when he got out and told her to wait for his return after he hid the gun used in the shooting). The inconsistent explanations she gave police during her interview, and the inconsistencies and implausibility of her trial testimony, impugned her credibility and undermined the persuasive value of her pastor's testimony that she attended Bible study and was involved in outreach programs. It was undisputed that she associated with members of the Rockwood gang (and no one testified her association was in support of any gang outreach program for her church or otherwise). According to her ex-husband, Cortez was street smart about gangs and knew what gangs are all about. As the prosecutor argued in closing, although Cortez was not a typical gang member, there was no rational explanation for her conduct, other than that she knew what was going to happen when she drove Bernal into rival gang territory.

Other evidence supported her intent to aid in a gang murder, such as Bernal's statements to his cousin that Bernal and a woman had gone to "shoot somebody," the letter Bernal wrote in jail to a friend asking him to find out if Cortez was "against" him and if so to tell her to "change her story," Cortez's willingness to drive Bernal around into rival gang territory knowing that Bernal always carried a gun, and witness testimony that Cortez yelled gang challenges and "Let them have it" at the scene of the shooting.

Accordingly, I would affirm Cortez's conviction.


GRIMES, J.


11