[No. H029370. Sixth Dist. Dec. 26, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JESUS VALENCIA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*This opinion is certified for publication with the exception of parts III.B., III.C.1. and III.C.2.

---

**COUNSEL**

Dallas Sacher, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MIHARA, Acting P. J.**—Defendant was convicted by jury trial of two counts of continuous sexual abuse of a child (Pen. Code, § 288.5) and two counts of forcible lewd conduct on a child (Pen. Code, § 288, subd. (b)(1)) for acts against his three younger sisters. He was committed to state prison for a term of 30 years. On appeal, he contends that his trial counsel was prejudicially ineffective in failing to obtain exclusion of his statement to the police on the ground that it was involuntary and in failing to object to and obtain the exclusion of other prejudicial and inadmissible evidence. He has also filed a petition for a writ of habeas corpus in which he repeats these same contentions, but does not submit any additional evidence to support them. We dispose of his habeas corpus petition by separate order. In the published portion of this opinion, we conclude that defendant's trial counsel was prejudicially deficient in failing to object to inadmissible evidence that the prosecution relied upon to prove the time period element of one of the continuous sexual abuse counts. Consequently, we reverse and remand for potential retrial on that count. In the unpublished portion of the opinion, we reject defendant's other contentions.

## I. Factual Background

Defendant's mother has eight children, including defendant and his sisters L., K. and D. In 2000, defendant came from Mexico to live with his mother in her home in San Jose where L., K. and D. also resided.

David and Rosalie Correa both worked at L.'s school and were acquainted with her. In the fall of 2003, L. told Rosalie Correa that she had seen defendant kissing K. on her mouth. In January 2004, L. told Rosalie Correa that defendant had "pulled off her blouse" while they "were horse playing." In February 2004, L., looking scared, nervous and embarrassed, told David Correa that her brother had "touched" her "in a bad way." David Correa told L. that she needed to tell her teacher or his wife, and David Correa informed Rosalie Correa of L.'s allegation. L. told Rosalie Correa that her brother had "crawled into bed with her" the previous week but "nothing happened." Rosalie Correa promptly filed a report with Child Protective Services (CPS).

Victoria Sandoval also worked at L.'s school and was acquainted with L. In March 2004, L. told Sandoval that defendant "tried to get in bed with her."

Sandoval reported this to CPS. L. subsequently told Sandoval that defendant was "touching her." L. said that she had told her mother, but her mother did not believe her.

On July 15, 2004, L., D. and K. encountered Sandoval at a Walgreens. K. told Sandoval that defendant "had been sticking his hand in their underpants and touching" K. and D. Sandoval took the girls to her home and tried unsuccessfully to contact CPS. She then contacted the police.

The police interviewed each of the girls twice that evening. In her initial interview, eight-year-old D. told the police that defendant had kissed her on the lips. He had also pulled her pants part of the way down, tried to remove her underpants and tried to put his hand on her private parts. This latter event had occurred in defendant's bedroom. D. insisted that there were "[t]wo times only."

In her initial interview, nine-year-old K. told the police that, a couple of years ago, defendant had pulled her pants part of the way down, but she had told him to stop, pulled her pants back up and run away. K. said defendant had tried to touch her four or five times. Several times, defendant had tried to remove her shirt, and one time he had succeeded. The time he succeeded, K. was wearing another shirt under that shirt. Defendant then proceeded to try to remove her pants, and he touched her chest near her neck. K. had recently seen defendant try to remove D.'s pants in their mother's bedroom. K. also described an incident that occurred in defendant's bedroom when he had offered to give her one of his fish if she took off her clothes. K. refused to do so. K. told L. about defendant's touchings, and L. said she "was gonna try [to get] somebody to help us."

In her initial interview, 14-year-old L. told the police that defendant had "tried to kiss" D. and "he touched their private." L. related that D. had told her that day that defendant had recently touched her private parts. L. said she had not known until that day that defendant was touching D. and K. Defendant had touched L. between her legs months earlier, when she was still 13. This touching had occurred on the stairs in the midst of an incident precipitated by defendant taking L.'s keys. L. and defendant began fighting. Defendant knocked her to the floor, hit her and then grabbed her between her legs over her clothing. L. responded by choking him. Defendant then somehow unsnapped her bra, pulled up her shirt and laughed at her.

L. described an occasion on which she had consumed six beers, and defendant had convinced her to spend the night in his bed. She said she had

spent the whole night in defendant's bed, but he had not touched her at all that night though he slept in the same bed. Both of them had slept fully clothed. L. denied that defendant had ever touched her under her clothing.

L. said she had told her older sister N. about defendant touching her, and N. had said that defendant had done the same thing to her. L. had also told her mother about defendant's conduct. Her mother cried and told her that there were cameras in the house "['c]ause they were watching" defendant "['c]ause they felt that he, he did drugs and stuff."

In her second interview that evening, D. told the police about an incident in defendant's bedroom when she and K. had gone to see defendant's fish. Defendant tried to remove their clothing. On another occasion, defendant had tried to kiss her on the lips. She insisted that these were the only two times defendant had touched her.

In her second interview, K. told the police that defendant had removed her and D.'s pants and tried to touch them. She also said that defendant had once rubbed her chest, skin to skin, a year earlier. K. also reported either having seen defendant touch D. once or having been told by D. that defendant had touched D. K. stated that defendant had once tried to pull her pants down, but she had hit him, pulled her pants back up and run away. This event had occurred in her mother's room the week before. She had been wearing shorts and underwear under her pants, so nothing was exposed by defendant's conduct, but defendant's action made her "scared" that he "was gonna touch" her "in my private." K. eventually disclosed that defendant had touched her "privates" on a separate fairly recent occasion. On a "really hot" day, D. and K. were sleeping on their parents' bed wearing only their underwear, and they were awakened by defendant touching their private parts under their underwear. K. felt defendant's hand on her private parts and saw him touching D.'s private parts also. K. said L. had told her that defendant had touched her and "my other sister, too."

In her second interview, L. was asked if defendant "fought with the police before." She said, "Um, yeah." L. again described her fight with defendant over the keys during which he touched her between her legs, "undid" her bra and pulled up her shirt. She had quickly pulled her shirt back down. L. insisted that this was the only time that defendant had touched her, but she "was already scared of him" because "he always stared at me and stuff . . . ." He had looked at her once when she was in the bathroom and another time when she was taking a shower. L. denied that defendant had ever "made you

have sex or nothing like that." L. reiterated that she had told her mom about the key incident, and her mother had cried. L. had not seen defendant touch her sisters, but they had told her that he had touched them two or three times. K. had told L. that defendant had tried to kiss D. and had touched both her and D. between their legs under their pants.

After the girls had been interviewed twice, the police told the girls' parents[1] that the girls were alleging that defendant had inappropriately touched them, and the police said that they wanted to talk to defendant the next morning. The next morning, defendant voluntarily came to the police station with his parents and said that he wanted to "clear the matter up."

During his police interview, defendant admitted L.'s accusations, although he claimed that the touchings had occurred accidentally during their fight. He also admitted that he had twice touched K.'s crotch over her clothing. According to defendant, these two events had occurred six months apart several years earlier. Finally, defendant admitted that he had touched K.'s vagina under her underwear the previous summer. He said he left his hand on K.'s vagina, under her panties, for three or four minutes. Defendant denied ever touching D. Defendant wrote a letter of apology to K. asking her "to excuse me for touching your intimate or private parts." He wrote a similar letter to L. asking her to excuse him "if some day I touched your intimate (private) parts" and saying he was "sorry for the day I pulled your blouse when I was playing with you."

On July 17, 2004, social worker Sylvia Roque interviewed the three girls and their mother. The mother told Roque that L. had told her that defendant had touched her vaginal area over her clothes while the two were "rough-housing." L. told Roque that she had told her mother about defendant touching her, but her mother had done nothing about it. L. said that defendant had touched her vaginal area over her clothes "while they were roughhous-ing." L. said nothing about defendant pulling up her shirt. L. also said that K. had told her that defendant had touched K. D. told Roque that defendant had pulled down K.'s pants. K. told Roque that defendant had touched D.'s vaginal area over her clothing.

In August 2004, L. told Rosalie Correa that defendant had "touched her sisters inappropriately, and a lot of bad things happened," but L. did not

---

[1] Actually, these were the mother of defendant, K., L. and D. and the father of K. and D. Defendant and L. share a different father.

"elaborate." L. did tell Rosalie Correa that defendant had been "touching" D. "since she was 4 years old." L. told Rosalie Correa that she "would be in trouble" if she told the truth. L. said her mother had told her that "she better deny that these things happened, otherwise they would go back again to a foster home and be taken out of their home." L. also said her mother had told her that her brother would go to prison and "bad things would happen to him there" if he was convicted. L.'s mother had also told her that her accusations against defendant were responsible for the family's lack of money and the mother's loss of her job.

In September 2004, D. told Gabriella Nielsen, her therapist, that defendant had touched and caressed the front of her genitals. In October 2004, D. told Nielsen, in D.'s mother's presence, that defendant had pulled down D.'s pants and touched D.'s private parts with his penis. D. also said that defendant had put his penis in K.'s mouth while they were under a fig tree in the backyard.

In September 2004, L., looking "very, very, very sad and confused," told Sandoval that L. "was going to have to lie to the police" because "her mother was pressuring her to lie." L. said her mother "wanted them to say that it didn't happen." L. explained that her mother was afraid that defendant would go to prison and "be hurt very bad" and that the children would be removed from their home. L.'s mother also had told L. that, if the molestation allegations were true, she would kill defendant and herself.

In October 2004, L. asked Sandoval to tell "the people" that Sandoval was lying. Sandoval "got angry" and refused, and L. seemed "relieved."

## II. Procedural Background

Defendant was originally charged by information with two counts of continuous sexual abuse of a child (Pen. Code, § 288.5), one count of assault with intent to commit a sex offense (Pen. Code, § 220), five counts of lewd conduct on a child (Pen. Code, § 288, subd. (a)), two counts of attempted lewd conduct on a child (Pen. Code, §§ 288, subd. (a), 664) and two counts of forcible lewd conduct on a child (Pen. Code, § 288, subd. (b)(1)). It was specially alleged that he had committed acts against more than one victim. (Pen. Code, § 1203.066, subd. (a)(7).)

Defendant was represented by a retained attorney throughout the trial court proceedings. Defendant's first jury trial in February 2005 resulted in a

mistrial after one juror held out for not guilty on all counts. The information was then amended to replace the assault with intent to commit a sex offense and attempted lewd conduct counts with lewd conduct counts, so that the information charged eight counts of lewd conduct, two counts of forcible lewd conduct and two counts of continuous sexual abuse. The continuous sexual abuse counts charged defendant with abusing K. and D. between July 1, 2002, and July 15, 2004. The eight lewd conduct counts charged defendant with individual acts of lewd conduct against K. and D. during this same period. The individual lewd conduct counts against K. and D. were alternatives to the continuous sexual abuse counts. The forcible lewd conduct counts charged defendant with offenses against L. The prosecution sought convictions on the continuous sexual abuse counts and on the forcible lewd conduct counts.

Defendant was retried in May 2005. D. testified at trial that defendant had never touched her private parts. She said she had lied about this to the police, Nielsen and others, but she was unable to explain why she had lied. She did affirm that she had "changed [her] story to help" defendant. D. said she was "sad" that defendant was not living at home anymore.

K. testified at trial that defendant had never touched her private parts, bottom or chest and that she had never seen him touch her sisters in any of those places. K. said she had told Sandoval that defendant had touched her because she wanted defendant to leave their home. K. said that L. had told her to tell Sandoval that defendant had touched her. K. testified that she had told a police officer that defendant had touched her and D., but "it wasn't true, I just made it up." She said she lied to the police officer because she was "mad" at defendant for throwing away some of her toys. K. was sad that defendant was not living at home anymore, and she thought it was her fault because she had lied to the police.

L. testified at trial that, although she got along well with defendant, "we'd fight a lot." Defendant "used to make me mad" when he teased her and made fun of her. Defendant had never touched her breasts or vagina, and she had never seen him touch D. or K. Nevertheless, L. initially falsely told David and Rosalie Correa and Sandoval that defendant had touched her vagina. L. testified that, at the beginning of July 2004, she told K. and D. to tell someone that defendant had touched their vaginas or else she would spank them. L. lied and told K. and D. to lie " 'cause I was mad, 'cause my mom treated him differently than me." L. was "jealous" of defendant because their mother "gave him money and stuff and she didn't give me" and "he would go out with his friends and I couldn't."

Defendant's 19-year-old sister N. testified for the defense at trial. She asserted that she had been present at the time of the two alleged touchings of L. by defendant, and these events had occurred when L. and defendant were "play fighting." N. testified that L. got mad at defendant because their mother gave him "special treatment," and L. wanted defendant to move out of the house and go back to Mexico. On cross-examination, N. testified that during her fights with defendant he would sometimes touch her crotch area "accidental[ly]." N. admitted that she had accused her father of sexually molesting her, and she claimed that she had told L. that this molestation accusation was false. N. said she had made the false accusation against her father because he "was not responsible" when she and defendant were living with him in Mexico and he "used to hit us at times."

Defendant's mother testified for the defense at trial that she had falsely told defendant and L. that she had installed hidden cameras in the house so that she would know if they were fighting. She denied that she had ever told any of the children to lie.

Defendant testified on his own behalf at trial. He denied ever touching L.'s crotch or lifting up her shirt. Defendant said he had made false admissions to the police because "I thought, if I say what the girls were saying, then they would let them come back home, and so I tried to tell the story more or less the way L[.] had." Defendant asserted that he had "made . . . up" his statements about having touched K. in hopes that his family could be reunited. "I thought that if I told that story, maybe that would be enough so that the girls could come back." Defendant denied ever having inappropriately touched L., K. or D. He admitted that he had fought with L., but he claimed that he stopped fighting with her "[w]hen I heard that, I think, they had installed cameras in the house."

The jury deliberated for about a day and a half. It returned guilty verdicts on the continuous sexual abuse counts against K. and D. and the two forcible lewd conduct counts against L., and it found true the allegation that defendant had committed lewd acts against more than one victim. The jury acquitted defendant of the individual lewd conduct counts "pursuant to the court's instructions that they were in the alternative." The trial court committed defendant to state prison for a term of 30 years. Defendant filed a timely notice of appeal.

### III. Discussion

### A. Standard of Review

■ Defendant contends on appeal that his trial counsel was ineffective. "Defendant has the burden of proving ineffective assistance of counsel. [Citation.] To prevail on a claim of ineffective assistance of counsel, a defendant ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice.' " [Citation.] A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . . Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

### B.–III.C.2.*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

### 3. Testimony About L.'s Statement About Defendant's Molestation of D.

■ The continuous sexual abuse count involving D. required proof of "three or more acts of substantial sexual conduct" "over a period of time, not less than three months in duration." (Pen. Code, § 288.5.) Because D. testified at trial that defendant had not abused her and D.'s statements to the police and others provided no timeframe for her allegations of sexual abuse, the prosecution had to resort to other sources of evidence to prove that defendant's abuse of D. had occurred over a period of at least three months. Defendant asserts that his trial counsel was prejudicially deficient in failing to object to the admission of Rosalie Correa's trial testimony that L. had told her that defendant had been "touching" D. "since she was 4 years old." Defendant asserts that this testimony would have been excluded if his trial

---

*See footnote, *ante*, page 92.

counsel had objected to its admission on personal knowledge grounds, since L. consistently reported that she had never seen defendant touch D. and did not learn of defendant's abuse of D. until the day that the girls reported the abuse to Sandoval.

### a. Background

D. told the police that defendant had kissed her once and, on another occasion, tried to remove her clothing and touch her private parts in his bedroom where she and K. had gone to look at his fish. D. insisted that these were the only two times he had touched her. D. provided no timeframe whatsoever for these events.

K. told the police about a recent incident during which she had seen defendant try to remove D.'s pants in their mother's bedroom. K. reported another incident when defendant had abused both her and D. in his bedroom when they came to look at his fish. K. also reported a third incident that had occurred on a "really hot" day in their mother's bedroom. On this third occasion, K. had seen defendant touching the private parts of both D. and K. under their underwear.

L. told the police that she had only learned that day, July 15, 2004, that defendant was touching D. and K. D. told her that defendant had recently touched D.'s private parts. L. reported that she had never seen defendant touch either of her sisters, but they had told her that he had touched them two or three times.

In his statement to the police, defendant admitted touching K. under her underwear during an incident in their mother's bedroom the previous summer. However, defendant adamantly denied touching D. on that occasion or on any other occasion.

Rosalie Correa testified at trial that L. told her defendant had been "touching" D. "since she was 4 years old," and the prosecutor highlighted this testimony in his argument to the jury. "There's Rosie Correa's testimony in which L[.] said that the defendant has been molesting D[.] since she was 4 years old. [¶] That's pretty clear that molestation has been going on for more than three months as is required to convict under this count."

## b. Analysis

"[T]he testimony of a *witness* concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter." (Evid. Code, § 702, subd. (a), italics added.) Defendant contends that the prosecution would have been unable to demonstrate that L. had personal knowledge of the timeframe of defendant's abuse of D. because L. had consistently and unequivocally stated that she never saw any abuse of D. and did not learn of defendant's abuse of D. until the day the girls reported the abuse to Sandoval and the police.

The Attorney General maintains that a personal knowledge objection to Rosalie Correa's testimony would have been properly overruled because "Correa had personal knowledge of L[.]'s statement." He suggests that Evidence Code section 702 does not require that a hearsay declarant have personal knowledge so it was irrelevant that L. lacked personal knowledge of defendant's abuse of D.

While there is no question that *Correa* had personal knowledge that *L. had made the statement* Correa recounted, we disagree with the Attorney General's suggestion that L.'s hearsay declaration was admissible *for its truth* notwithstanding *L.'s* lack of personal knowledge of the truth of her statement. Although we have not been directed to, nor have we discovered, any California cases addressing this specific point, federal courts uniformly impose a personal knowledge requirement on hearsay declarations and at least one state court imposes the same requirement.

"Courts require that declarants of a hearsay statement have firsthand knowledge before the hearsay statement is admissible, however. [Citations.] The party offering a statement has the burden of proving personal knowledge." (*State v. Richardson* (Minn. 2003) 670 N.W.2d 267, 282.) "In a hearsay situation, the declarant is, of course, a witness, and neither this rule[, Federal Rules of Evidence, rule 803,] nor Rule 804 dispenses with the requirement of firsthand knowledge." (Advisory Com. Notes to Fed. Rules Evid., rule 803, 28 U.S.C.; see *Bemis v. Edwards* (9th Cir. 1995) 45 F.3d 1369, 1373.)

The rationale for requiring a hearsay declarant to have personal knowledge when the declarant's statement is admitted for its truth is identical to the rationale for requiring a witness to have personal knowledge of the subject matter of the witness's testimony. In the absence of personal knowl-

edge, a witness's testimony or a declarant's statement is no better than rank hearsay or, even worse, pure speculation. The admission of a hearsay statement not based on personal knowledge puts the fact finder in the position of determining the truth of a statement without knowledge of its source and without any means of evaluating the reliability of the source of the information. We are convinced the personal knowledge requirement applicable to witnesses is equally applicable to hearsay declarants.

The Attorney General argues that "there is no doubt" that the prosecutor would have been able to establish that L. had the requisite personal knowledge. The record amply rebuts this argument. L. has consistently and repeatedly stated that she did not know that defendant had abused D. until the day that the girls reported defendant's abuse to the police. Thus, L. clearly lacked *personal knowledge* of *when* defendant's abuse of D. occurred. Defendant has established that a personal knowledge objection to Correa's testimony would have succeeded.[3]

The Attorney General's suggestion that Correa's testimony was admissible for something other than the truth of the matter is pointless. The prejudice that defendant claims is from the admission of this testimony for its truth. Had it not been admitted for its truth, the prosecutor could not have relied upon it to satisfy the "not less than three months in duration" element of the count charging defendant with continuous sexual abuse of D. (Pen. Code, § 288.5.)

Finally, the Attorney General claims that defendant was not prejudiced by his trial counsel's failure to obtain exclusion of this evidence. While there was some other evidence from which the jury could have *inferred* that defendant had been abusing D. for more than three months, this evidence was far less compelling than Correa's testimony regarding L.'s statement. The exclusion of the most compelling evidence to support an element of the offense might well have opened the door to a reasonable doubt about whether defendant's abuse of D. lasted for three months or more.

Consequently, we lack confidence that the jury would have found defendant guilty of the continuous sexual abuse of D. if defendant's trial counsel had not failed to obtain exclusion of this inadmissible evidence. Reversal of this count is required.

---

[3] Correa did not testify that L. said that D. *had told her that* defendant had been abusing D. since D. was four years old. We express no opinion on whether such testimony would have been admissible over a hearsay objection.

## IV. Disposition

The judgment is reversed and remanded for potential retrial on the count alleging continuous sexual abuse of D. If the prosecutor elects not to retry this count, the trial court shall resentence defendant on the other counts.

McAdams, J., and Duffy, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 18, 2007, S149928. George, C. J., did not participate therein.