Filed 10/21/21; Certified for Publication 11/12/21 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PAMELA SHEREE CHAMBERS, | D079074 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 18CV338800) |
| CROWN ASSET MANAGEMENT, LLC, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of Santa Clara County, Thomas E. Kuhnle, Judge. Affirmed.

Carlson & Messer, David J. Kaminski and Stephen A. Watkins, for Defendant and Appellant.

Consumer Law Center, Fred W. Schwinn, Raeon R. Roulston, and Matthew C. Salmonsen, for Plaintiff and Respondent.

Pamela Sheree Chambers filed a putative class action lawsuit against Crown Asset Management, LLC (Crown) based on alleged violations of the California Fair Debt Buying Practices Act (CFDBPA; Civ. Code, § 1788.50 et seq.). Crown moved to compel arbitration. It relied on an affidavit from an employee of Chambers's original creditor, Synchrony Bank (Synchrony), who

stated in part that "Synchrony's records" show a credit card account agreement containing an arbitration clause was mailed to Chambers. Chambers objected to the affidavit on various evidentiary grounds. The trial court sustained the objections and denied Crown's motion to compel arbitration.

Crown appeals. It contends the trial court erred by sustaining Chambers's evidentiary objections and denying the motion to compel. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In her complaint, Chambers alleged that she received a written communication from a debt collector contracted by Crown that failed to comply with the CFDBPA's notice formatting requirement. (Civ. Code, § 1788.52, subd. (d)(1).) Chambers allegedly incurred the debt as a result of a consumer credit card account issued by Synchrony. Synchrony sold the alleged debt to Crown for collection purposes. Chambers sought statutory damages (*id.*, § 1788.62, subds. (a)-(b)) and other relief.

Crown moved to compel arbitration. It contended that Synchrony sent Chambers a credit card account agreement, with an arbitration clause, when Chambers opened the account and again when Chambers received a replacement card a few years later. The agreement allowed Chambers to reject the arbitration clause by written notice within 60 days, but Synchrony did not receive any such notice. Based on these and other facts, Crown argued that Chambers agreed to the arbitration clause, the clause covered her CFDBPA claim, and the dispute should be ordered to arbitration.

To support its contentions, Crown relied on an affidavit from Jodi Anderson, who was employed by Synchrony as a litigation analyst. Anderson stated she had "personal knowledge of the business records of Synchrony"

2

and was "a qualified person authorized to declare and certify on behalf of Synchrony." She wrote, "My responsibilities include regularly accessing Synchrony's cardholder records and helping to maintain and compile histories of credit card accounts. I also regularly review and analyze account records and transaction histories, including communications to and from cardholders."

Anderson continued, "On or about December 13, 2012, Synchrony approved an application in the name of Pam Chambers for a [credit card] and opened an account in her name . . . . Synchrony's records show that on or about December 13, 2012, the card and a copy of the [account agreement] were mailed to Pam Chambers at the address of record on the Account. . . . Synchrony has no record that the card or the Account Agreement were returned as undeliverable." In essentially the same language, Anderson described Synchrony's mailing of a replacement card and another account agreement a few years later. Anderson attached copies of both account agreements to her affidavit. She did not attach any documentation regarding mailing.

As to the opt-out provision, Anderson explained, "As part of Synchrony's regular activities in the ordinary course of business, Synchrony maintains a record of any correspondence it receives from its cardholders, including requests to reject or opt out of an arbitration provision. I have reviewed Synchrony's records, and I have found no record of a notice from Pam Chambers exercising her right to reject the arbitration provision."

Anderson stated that "Synchrony's records reflect that purchases and payments were posted to the account." She attached 12 billing statements, approximately 30 pages, to her affidavit. Later, "[d]ue to non-payment," the outstanding account balance was charged off, and Synchrony sold Chambers's

3

account to Crown. (A Crown employee also submitted a declaration attaching, among other things, a similar sheaf of billing statements.)

Chambers opposed the motion to compel arbitration. She primarily contended that Crown had not shown an agreement to arbitrate existed between her and Synchrony. Specifically, Chambers argued that Crown had not shown she received the account agreement and failed to object. Chambers filed evidentiary objections to portions of Anderson's affidavit, including her statement that "Synchrony's records" show that copies of the account agreement were mailed to Chambers. These objections included hearsay, lack of foundation, and lack of personal knowledge. Chambers also claimed that Anderson's affidavit ran afoul of the secondary evidence rule and, as to any underlying Synchrony records, Crown had not shown they were business records.

On reply, Crown maintained that Anderson had personal knowledge "based upon her review of the relevant business records of Synchrony," including Chambers's account. It contended Anderson's affidavit satisfied the secondary evidence rule as to "the content of Synchrony's business records," because among other things there was no genuine dispute about their material terms. It claimed "the documents [Anderson] reviewed and attached" to her affidavit satisfied the requirements for the business records exception to the hearsay rule.

After hearing argument, the trial court denied Crown's motion to compel arbitration. In a detailed order, the court wrote, "Unlike many motions to compel arbitration, [Crown] relies on testimony—not documents— to show [Chambers's] assent to arbitration. Anderson relies solely on what 'Synchrony's records show' to prove Synchrony mailed the arbitration agreement to [Chambers]. [Citation.] Anderson does not describe what those

4

records looked like (e.g., whether they were electronic or paper records) and does not testify regarding their reliability or why she is testifying as to the contents of those records rather than attaching the records to her affidavit. Further, Anderson does not testify she has any personal knowledge regarding the mailing of the arbitration agreement outside what the 'records show.' Anderson provides no information regarding the regular business practices or procedures of Synchrony Bank with regard to the mailing of credit card agreements. All she says is that 'Synchrony approved an application' and then, based on unspecified records, she says Synchrony mailed the credit agreement to [Chambers]. [¶] The Court finds the Anderson Affidavit lacks foundation and violates the secondary evidence rule and therefore does not provide admissible evidence showing the Agreement was mailed to [Chambers]. Consequently, [Crown] has not met its burden to show the existence of an arbitration agreement between the parties to which [Chambers] assented." Crown appeals.

DISCUSSION

I

*Motions to Compel Arbitration*

California statutes create a "summary proceeding" for resolving petitions or motions to compel arbitration. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972 (*Engalla*).) "The petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. [Citation.] In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other

5

documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination."[1] (*Ibid.*)

"Thus, our Supreme Court has clearly stated that a court, before granting a petition to compel arbitration, *must* determine the factual issue of 'the existence or validity of the arbitration agreement.' [Citation.] In this way, a court's role, though limited, is critical. 'There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate and which no statute has made arbitrable.' " (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1219-1220 (*Toal*).)

" 'An "arbitration agreement is subject to the same rules of construction as any other contract . . . ." ' [Citation.] For any contract, the parties' consent is a basic element. [Citation.] In addition, the parties' consent must be communicated to one another. [Citation.] Thus, a party's consent is essential to 'the contractual underpinning of the arbitration procedure . . . .' [Citation.] '[T]he asserted absence of contractual consent renders arbitration, by its very

---

[1] Crown repeatedly points out that Chambers provided no contrary evidence on the existence of an arbitration agreement. But it was not Chambers's burden to disprove the existence of such an agreement. As the moving party, Crown had the burden of establishing through admissible evidence that Chambers had agreed to arbitrate the dispute. (See *Engalla, supra,* 15 Cal.4th at p. 972.) Similarly, the presumption of receipt after mailing only arises if the fact of mailing is shown. (See *Craig v. Brown & Root* (2000) 84 Cal.App.4th 416, 421.) Crown cites *Melorich Builders v. Superior Court* (1984) 160 Cal.App.3d 931, 934, for the proposition that "the court is entitled to accept as true the facts alleged in the movant's affidavits, provided they are within the personal knowledge of the affiant and are facts to which he could competently testify." But here, as discussed below, the crucial fact of mailing is *not* within Anderson's personal knowledge. Contrary to Crown's assertion, the trial court's decision could not have simply "started and stopped with this analysis."

6

definition, inapplicable to resolve the issue.' " (*Toal*, *supra*, 178 Cal.App.4th at p. 1221.)

"A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement. A signed agreement is not necessary, however, and a party's acceptance may be implied in fact [citation] or be effectuated by delegated consent [citation]. An arbitration clause within a contract may be binding on a party even if the party never actually read the clause." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (*US*)*, LLC* (2012) 55 Cal.4th 223, 236.) Crown contends that Chambers accepted the arbitration agreement by using her credit card after receiving the terms of the account agreement and failing to opt out of its arbitration clause. (See *Cavalry SPV I, LLC v. Watkins* (2019) 36 Cal.App.5th 1070, 1081 (*Cavalry SPV*).)

## II

### *Standards of Review*

" 'There is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed.' " (*Carlson v. Home Team Pest Defense, Inc.* (2015) 239 Cal.App.4th 619, 630.) Here, the trial court's order is based on a decision of fact, i.e., whether Synchrony mailed the credit card account agreement containing an arbitration clause to Chambers.

Because the trial court excluded Crown's evidence on this factual issue, Crown primarily challenges the court's underlying evidentiary rulings. "Trial court rulings on the admissibility of evidence . . . are generally reviewed for abuse of discretion." (*Pannu v. Land Rover North America, Inc.* (2011)

7

191 Cal.App.4th 1298, 1317; accord, *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)[2]

Crown claims the rules of evidence are "relaxed" in connection with a motion to compel arbitration. The import of Crown's proposed "relaxed" standard is unclear. In any event, Crown has not shown the trial court erred by applying the Evidence Code. Crown cites an unpublished federal district court order for the proposition that a trial court may consider written declarations in connection with a motion to compel arbitration, notwithstanding the fact that such declarations would be considered hearsay

---

[2] Crown contends we should employ the de novo standard of review, based on an analogy to summary judgment appeals. Some courts have held that de novo review is appropriate in that context because summary judgment presents only a question of law and is decided on the papers alone. (See, e.g., *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1451; but see *Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118 [abuse of discretion].) Crown's analogy is inapt. A court sits as a trier of fact when considering a motion to compel arbitration. (*Engalla, supra,* 15 Cal.4th at p. 972.) The moving party must prove the existence of a valid arbitration agreement by a preponderance of the evidence. (*Ibid.*) A motion to compel arbitration therefore presents issues of fact as well as law. Crown relies on a footnote in *Engalla,* in which the Supreme Court described a motion to compel arbitration as a "quasi-summary-judgment motion." (*Id.* at p. 973, fn. 7.) But the Supreme Court was describing the specific circumstances before it, where the trial court had "apparently abdicated its role as trier of fact," so the Supreme Court was required to remand the matter unless there was no triable issue of fact for the trial court to consider. (*Id.* at p. 973.) That is not the situation here.

at trial.  (See *Lomeli v. Midland Funding, LLC* (N.D.Cal., Sept. 26, 2019, No. 19-CV-01141-LHK) 2019 WL 4695279, at *7 (*Lomeli*).)  On this point, California law is similar.  A motion to compel arbitration "shall be heard in a summary way in the manner . . . provided by law for the making and hearing of motions."  (Code Civ. Proc., § 1290.2.)  Hearing and determination in this manner "would ordinarily mean the facts are to be proven by affidavit or declaration and documentary evidence, with oral testimony taken only in the court's discretion."  (*Rosenthal v. Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394, 413-414; see Code Civ. Proc., § 2009.)  The trial court followed this procedure.  It did not exclude Anderson's affidavit because, as a written document, it was technically hearsay.

Crown cites *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931 (*Sweetwater Union*), but it did not involve arbitration.  It considered an anti-SLAPP motion (Code Civ. Proc., § 425.16), which has distinct purposes and procedures.  (*Sweetwater Union*, at p. 940.)  In particular, the second step of the anti-SLAPP analysis requires a trial court to determine whether the plaintiff has shown " 'a probability of success,' " which is a " ' "summary-judgment-like procedure." ' "  (*Ibid.*)  " 'The court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.' "  (*Ibid.*)  In this context, the Supreme Court held that a trial court may consider written statements "if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial."  (*Id.* at p. 949.)  "It may not be possible at the [anti-SLAPP] hearing to lay a foundation for trial admission, even if such a showing could be made after full discovery. . . .  To strike a complaint for failure to meet evidentiary obstacles

9

that may be overcome at trial would not serve the SLAPP Act's protective purposes. Ultimately, the SLAPP Act was 'intended to end meritless SLAPP suits early without great cost to the target' [citation], *not* to abort potentially meritorious claims due to a lack of discovery." (*Ibid*.)

In contrast to an anti-SLAPP motion, a motion to compel arbitration requires the court to sit as a trier of fact and make factual findings regarding the existence of an arbitration agreement. (*Engalla, supra,* 15 Cal.4th at p. 972; *Toal, supra,* 178 Cal.App.4th at pp. 1219-1220.) A hearing on a motion to compel arbitration does not serve a mere gatekeeping function. It is the proceeding in which these factual issues are addressed. The standard articulated in *Sweetwater Union* makes no sense in the arbitration context. There is no future trial concerning the existence and coverage of an arbitration agreement where such statements would be any more relevant or admissible than at the hearing on a motion to compel arbitration. Crown has not shown the *Sweetwater Union* anti-SLAPP standard should apply here.

III

*Evidentiary Objections*

Crown contends the court erred by excluding the Anderson affidavit because it was admissible under the secondary evidence rule (Evid. Code, §§ 1521, 1523)[3] and the underlying Synchrony documents qualified as business records (§ 1271). Again, we review the court's exclusion on these grounds for abuse of discretion. (See, e.g., *People v. Hovarter* (2008) 44 Cal.4th 983, 1011 [business records]; *Penny v. Wilson* (2004) 123 Cal.App.4th 596, 602 [secondary evidence].)

---

[3] Subsequent statutory references are to the Evidence Code unless otherwise specified.

10

The current secondary evidence rule descends from "the venerable common law rule that lost documents may be proved by secondary evidence." (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1068.) Section 1521, subdivision (a) provides, "The content of a writing may be proved by otherwise admissible secondary evidence. The court shall exclude secondary evidence of the content of [a] writing if the court determines either of the following: [¶] (1) A genuine dispute exists concerning material terms of the writing and justice requires the exclusion. [¶] (2) Admission of the secondary evidence would be unfair."

The business records exception to the hearsay rule provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (§ 1271.)

The court's analysis in *Pajaro Valley Water Management Agency v. McGrath* (2005) 128 Cal.App.4th 1093 (*Pajaro Valley*) provides a helpful introduction to the relationship between these two statutes. In that case, a public agency sought to establish its damages with a declaration from its general manager. (*Id*. at p. 1106.) The declaration stated the total amount owed, based on bills the public agency sent to the defendant. (*Ibid*.) Attached to the declaration was a table summarizing the agency's claimed damages. (*Ibid*.) The defendant objected to the declaration on various grounds, but the trial court overruled his objections. (*Id*. at pp. 1106-1107.)

11

The appellate court reversed. (*Pajaro Valley, supra*, 128 Cal.App.4th at p. 1097.) As an initial matter, the court noted the general manager's declaration was technically hearsay, but it was not inadmissible for that reason under the general authorization for motion practice. (*Id.* at p. 1107.) The problem with the declaration was the amount of damages stated. (*Ibid.*) It reflected another layer (or two) of hearsay, including the underlying bills and the calculation table. (*Ibid.*) The court explained, "The original bills might be admissible over a hearsay objection as business records [citation] or perhaps official records [citation], but to establish either exception would require a showing of the time and circumstances of the documents' creation. [Citations.] No such showing was attempted." (*Ibid.*)

The court in *Pajaro Valley* explained that the secondary evidence rule did not save the declaration. "Section 1521 permits the introduction of 'otherwise admissible secondary evidence' to prove the contents of a writing. It does not excuse the proponent from complying with other rules of evidence, most notably, the hearsay rule. [Citation.] As applicable here, section 1521 means only that the Agency could introduce secondary evidence to establish the contents of bills if (1) the contents themselves were admissible, and (2) the secondary evidence was 'otherwise admissible.' (§ 1521, subd. (a).) Here the contents of the bills were hearsay. In the absence of a showing that they came within an exception, secondary evidence of their contents was no more admissible than the bills themselves, which is to say, not at all." (*Pajaro Valley*, *supra*, 128 Cal.App.4th at p. 1108.)

The trial court here was confronted with an analogous situation. Anderson's affidavit expressly referenced "Synchrony records" as the basis for her statement that the credit card account agreement had been mailed to Chambers. In order for Anderson's statement to be admissible, the

underlying Synchrony records would have to be admissible (among other conditions).

Crown argues that the underlying Synchrony records were admissible as business records under section 1271. It references Anderson's statement that she "regularly review[s] and analyze[s] account records and transaction histories, including communications to and from cardholders." Crown argues this statement shows that "Synchrony's account records and transaction histories are made in the regular course of business." (See § 1271, subd. (a).) The trial court could reasonably find otherwise. While Anderson states she regularly reviews and analyzes the records, she does not say anything about their preparation. Nor does she describe the specific "Synchrony records" she relied upon to state that Chambers had been mailed the account agreement. The trial court could reasonably find that Anderson had not shown those specific records—whatever they were—were made in the regular course of Synchrony's business.

For the same reasons, the trial court could reasonably find that Anderson's affidavit was insufficient to establish that the unspecified records were "made at or near the time of the act, condition, or event" and "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (§ 1271, subds. (b), (d).) Information about the sources of information and the method and time of preparation of the records, including whether they were prepared at or near the time of alleged mailing, is completely absent from Anderson's affidavit.

Crown relies on *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301 (*Jazayeri*), but it shows the inadequacy of Anderson's affidavit. *Jazayeri* involved a dispute between the plaintiff, a chicken supplier, and the defendant, a poultry processor. (*Id*. at p. 306.) To support its claims, the plaintiff sought

13

to introduce purchase orders and other documentary records showing the number of chickens that were found dead on delivery to the defendant (the DOA number). (*Id.* at pp. 308-309, 313.) The trial court found that the plaintiff had not shown they were business records, and it sustained the defendant's evidentiary objection. (*Id.* at p. 314.)

The appellate court held this was error. (*Jazayeri*, *supra*, 174 Cal.App.4th at p. 305.) It noted that the plaintiff "testified that the DOA count was obtained on the date of delivery after the chickens were unloaded by [defendant's] employee and generally written on the purchase order." (*Id.* at p. 322.) Several employees of the defendant "testified concerning the manner of preparing the DOA count. Alland Zapata, head of quality control, testified that when chickens were delivered, one of [the defendant's] employees counted the DOA chickens and recorded the total on the purchase order or other handy piece of paper; Zapata then used that document to fill in the DOA box on the [documents]. Susan Mao testified at her deposition that DOA chickens were counted by an employee of [the defendant] at the time of delivery. Pitman, the defense expert, confirmed that the procedures for counting and recording the number of DOA chickens described by [the plaintiff] were followed generally in the industry." (*Id.* at pp. 322-323.) Based on this evidence, the appellate court concluded that the DOA number qualified as a business record because it "was obtained through a count performed in the regular course of business by [defendant's] employee and transmitted to Zapata, who was responsible for inputting that information onto the [documents]." (*Id.* at pp. 323-324.)

Crown points out *Jazayeri*'s comment that evidence should not be excluded "because the offering party did not follow the standard or preferred method of laying the foundation for admission." (*Jazayeri*, *supra*,

14

174 Cal.App.4th at p. 324.) But in *Jazayeri*, "the means by which the DOA numbers were routinely recorded on the [documents] was sufficiently established by witnesses with firsthand knowledge of the process to qualify the evidence for admission under section 1271." (*Id*. at p. 324.) The trial court here could reasonably find that Crown did not provide any comparable information. Among other things, Anderson did not describe how the information in Synchrony's records regarding mailing was entered or maintained. The portion of Anderson's affidavit cited by Crown, that she "regularly review[s] and analyze[s] account records and transaction histories," shows the records exist but it does not provide information about the means by which they were prepared.

Crown also relies heavily on *People v. Dorsey* (1974) 43 Cal.App.3d 953 (*Dorsey*).) In that case, involving charges of writing bad checks, a bank operations officer testified that "he was the custodian of the bank's records and that all the records involved were kept in the normal course of business." (*Id*. at p. 958.) Based on the bank's records, the officer testified about the date the defendant opened an account, the date the bank closed the account, and the fact of various insufficient fund items that were presented and rejected. (*Ibid*.) On appeal, the defendant contended that the officer's testimony was inadmissible because the underlying records were not business records. (*Id*. at pp. 959-960.) The appellate court noted that the officer brought with him various records, including "monthly statements from the date the account was opened until it was closed" and various overdraft notices. (*Id*. at p. 960.) Although the defendant objected based on hearsay and foundation, he did not cite the business records exception. The appellate court found he had waived the issue. (*Ibid*.) The court stated, "The only apparent defect in the foundation required by . . . section 1271 was in the

15

failure of [the officer] to testify as to the mode and time of preparation of the bank statements. This oversight obviously could have been remedied if appellant's counsel had objected on that specific ground; his failure to do so should prevent his asserting this ground on appeal." (*Ibid*.)

The court went on, "Moreover, we believe that bank statements prepared in the regular course of banking business and in accordance with banking regulations are in a different category than the ordinary business and financial records of a private enterprise. It is common knowledge that bank statements on checking accounts are prepared *daily* and that they consist of debit and credit entries based on the deposits received, the checks written and the service charges to the account. We fail to see where appellant has been prejudiced by the absence of testimony as to the 'method' of preparation of the records, i.e., whether by hand or by computer and from what sources. Such testimony would not have a bearing on the basic trustworthiness of the records. While mistakes are often made in the entries on bank statements, such matters may be developed on cross-examination and should not affect the admissibility of the statement itself." (*Dorsey*, *supra*, 43 Cal.App.3d at pp. 960-961.) The court found no abuse of discretion in admitting the bank officer's testimony. (*Id*. at p. 961.)

*Dorsey* does not aid Crown under the circumstances here. First, even accepting that bank statements may be more readily found to be business records than other hearsay documents, bank statements are not at issue here. What is at issue are the records showing the mailing of the credit card account agreement to Chambers. Their nature and mode of preparation is unknown. The fact that they were apparently maintained by a bank is not dispositive. "A rule allowing or requiring admissibility of any document found in a bank's records without evidence of reliability would be a sharp

break with past practice [and] could raise grave implications for the continued maintenance of reliable bank records over the long term." (*Remington Investments, Inc. v. Hamedani* (1997) 55 Cal.App.4th 1033, 1039.) Second, *Dorsey* considered a situation where the trial court *admitted* the testimony, and it noted a trial court's "broad discretion in admitting business records" under section 1271. (See *Dorsey*, *supra*, 43 Cal.App.3d at p. 961.) It did not consider whether and under what circumstances a contrary ruling would be an abuse of discretion.[4]

Crown contends that the elements of the business records exception can be inferred from the circumstances, but it has not shown the court abused its discretion by finding Crown's showing inadequate. Crown claims the court should have inferred that Synchrony's "account records and transaction histories" were made at or near the time of mailing, but it provides no basis for such an inference—other than the implicit assumption that a business should work that way. The trial court was not required to make this inference based on the scant information Crown provided.

Crown points to the fact that Chambers received her credit card from Synchrony and she received other correspondence at the address identified by Anderson. But only Anderson's review of "Synchrony's records" shows that the credit card and account agreement were mailed at the same time or to

---

[4]     Crown also cites *People v. Lugashi* (1988) 205 Cal.App.3d 632, but in that case the record showed that "the computer entries . . . were made as they occurred in the regular course of business" and the witness "identified the record and explained its mode of preparation." (*Id*. at p. 641.) The primary issue was whether "testimony on the acceptability, accuracy, maintenance, and reliability of the bank's computer hardware and software should have been produced." (*Id*. at p. 642.) *Lugashi* held that such testimony was not required. (*Ibid*.) No analogous issue exists here.

17

that address. Crown's position still depends on the admissibility of the underlying records regarding mailing.

Crown claims the court "erred by holding Ms. Anderson had to attach the 'account records and transaction histories' she reviewed." Our review of the court's order reveals no such mandate. The court referenced the lack of records as the reason for its close examination of Anderson's affidavit, since that was the only evidence of mailing provided by Crown. Additionally, the court found it noteworthy that Anderson had not attached any records, and had only vaguely alluded to unspecified Synchrony records, to prove mailing. The trial court was entitled to consider these circumstances when evaluating Anderson's affidavit. We note that Anderson attached other records, including dozens of pages of Chambers's account statements, but not any record of mailing.[5]

Crown argues Anderson's statements were admissible under section 1523, subdivision (d) as a summary of a voluminous record. That

---

[5] Crown relies on *Unifund CCR LLC v. Dear* (2015) 243 Cal.App.4th Supp. 1, but in that case the declarant attached the relevant records. (*Id.* at p. 5.) In addition, the declarant "asserted she had personal knowledge of the manner, methods and practices by which plaintiff maintains its business records and otherwise does business. The various assignments and records attached to the declaration are asserted to be maintained by plaintiff in the form of computerized account records kept in the ordinary routine course of business by plaintiff. Computerized ledgers were also asserted to be maintained by plaintiff. She stated these computerized ledgers maintained by plaintiff constituted the principal records for amounts due and owing to plaintiff for all transactions that occurred when defendant used the original creditor's card account. Since this description coincides with our commonsense understanding of how credit card records are electronically generated, we cannot find that the trial court abused its discretion in finding that [the declarant] adequately laid the foundation to authenticate the billing statements as business records within the meaning of . . . section 1271." (*Id.* at pp. 7-8.) No similar showing was made here.

statute provides that "[o]ral testimony of the content of a writing" may be admissible "if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole." (*Ibid*.) Setting aside whether Anderson's affidavit is oral testimony (and the other issues that might raise), Crown's argument does not justify reversal. First, Crown did not argue in the trial court that Anderson's statements were admissible under this statute and subdivision. Crown may not raise a theory of admissibility for the first time on appeal. (See *People v. Hines* (1997) 15 Cal.4th 997, 1034, fn. 4.) Second, Crown has not shown the records of mailing were voluminous or otherwise satisfied the requirements of the statute. The authorities Crown cites bear no relation to the circumstances here. (See *Vanguard Recording Society, Inc. v. Fantasy Records, Inc.* (1972) 24 Cal.App.3d 410, 418-419 [affirming admission of a summary of "some 50,000 sales invoices," where it was "clear that the summary was prepared from admissible business records" and the underlying records had already been made available to the opposing party]; see also *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 294 [affirming admission of a "schedule of assets" that was "a general compilation of documents that could not be examined individually by the court without great loss of time"].) Crown references a "computer database" that "cannot be examined in court," but such a database is not mentioned in Anderson's affidavit. And, even presuming its likely existence, Crown has not explained why examination of the whole database, rather than the relevant individual record, would be necessary or useful to show mailing.

Crown additionally contends the trial court erred by finding that Anderson "provide[d] no information regarding the regular business practices

19

or procedures of Synchrony Bank with regard to the mailing of credit card agreements." Crown asserts that Anderson provided "overwhelming evidence that it was the regular custom and practice of Synchrony to mail cardholder Agreements (and accompanying arbitration provisions) to consumers." This assertion is wholly unsupported by the record. Crown relies on the following statement from Anderson: "As part of Synchrony's regular activities in the ordinary course of business, Synchrony maintains a record of any correspondence it receives from its cardholders, including requests to reject or opt out of an arbitration provision." This statement discusses Synchrony's regular practice of maintaining a record of whatever is *received*. It does not mention a practice of maintaining a record of whatever is *sent*. And, even if it did so, it still says nothing about what Synchrony sends to its cardholders in the regular course of business, or when it does so.

Crown relies on numerous and largely unpublished federal decisions, but they highlight the shortcomings of Anderson's affidavit. The evidence in these decisions included an explicit statement of the custom and practice of mailing, i.e., what was sent, and when, in the regular course of business. (See *Izett v. Crown Asset Management, LLC* (N.D.Cal., Oct. 1, 2019, No. 18-CV-05224-EMC) 2019 WL 4845575, at *4 [declarant stated "that it has been the Bank's 'regular business practice to send a new card agreement to customers at the time they open a new account' "]; *Lomeli*, *supra*, 2019 WL 4695279, at *5 [declarant stated "it is Citibank's regular business practice to mail a card agreement to customers at the time of the opening of an account"]; *Brecher v. Midland Credit Management, Inc.* (E.D.N.Y., March 13, 2019, No. 18-CV-3142 (ERK) (JO)) 2019 WL 1171476, at *4 [declarant stated that Synchrony " 'had a regular procedure of mailing, via United States Postal Service, the credit card and a copy of the credit card agreement that

20

governed the account for each new Old Navy cardholder' "]; *Biggs v. Midland Credit Management, Inc.* (E.D.N.Y., March 9, 2018, No. 17-CV-340 (JFB) (ARL)) 2018 WL 1225539, at *8 [declarant stated that "at the time plaintiff's account was opened, 'Synchrony had a regular procedure of mailing a letter via United States Postal Service containing the account number, and a copy of the credit card agreement that governed the account for each new Amazon cardholder' "]; *Oyola v. Midland Funding, LLC* (D.Mass. 2018) 295 F.Supp.3d 14, 15-16 [declarant stated that "after an account holder opens an account, Credit One mails their credit card, enclosed with Credit One's [cardholder agreement]"]; *Beattie v. Credit One Bank* (N.D.N.Y., Aug. 9, 2016, No. 5:15-CV-1315 (LEK/TWD)) 2016 WL 4203511, at *3 [declarant stated "that including a Cardholder Agreement when mailing a credit card is Defendant's policy"]; *Flowers v. Citigroup Inc.* (S.D.Cal., Sept. 9, 2013, No. 12-CV-2748-CAB (NLS)) 2013 WL 12075973, at *1 [declarant stated that " '[p]ursuant to regular office practices and procedures in place as of September 2005, [a] Card Agreement was included with the cards mailed to customers, like Plaintiff, after an account was opened' "]; *Chavez v. Bank of America* (N.D.Cal., Oct. 7, 2011, No. C 10-653 JCS) 2011 WL 4712204, at *7-8 [declarant describing mailing "in the ordinary course of the . . . enrollment process"]; *Haas v. J.A. Cambece Law Office, P.C.* (S.D.Cal., April 5, 2006, No. 05cv2039 DMS (RBB)) 2006 WL 8455381, at *3 [declarant stated "that 'at the time MBNA acquired the account, it was the general policy of MBNA to provide the Credit Card Agreement to all of its cardmembers' "]; see also *Cavalry SPV, supra*, 36 Cal.App.5th at p. 1082 [witness testified "that Citibank's regular practice was to provide a copy of the terms and conditions governing the use of the card along with the card"].)

Crown also relies on several decisions that credited the personal knowledge of the declarant or witness. (See *People ex rel. Owen v. Media One Direct, LLC* (2013) 213 Cal.App.4th 1480, 1484 [declarant stated "the Department sent certain correspondence to Media One" and attached the documents; "[t]he trial court was entitled to accept [the declarant's] assertion of personal knowledge"]; *Mason v. Midland Funding LLC* (11th Cir. 2020) 815 Fed.Appx. 320, 329 [declarant had "personal knowledge of the mailing"]; *Kensu v. JPay, Inc.* (E.D.Mich., March 11, 2019, No. 18-11086) 2019 WL 1109948, at *3, fn. 4 ["the Court is satisfied that the information in the affidavit is based on [the declarant's] personal knowledge"].)

Personal knowledge is " 'a present recollection of an impression derived from the exercise of the witness'[s] own senses.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 356.) Unless a witness is testifying as an expert, "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (§ 702, subd. (a).) "In the absence of personal knowledge, a witness's testimony or a declarant's statement is no better than rank hearsay or, even worse, pure speculation." (*People v. Valencia* (2006) 146 Cal.App.4th 92, 103-104.) Anderson's affidavit shows she has no personal knowledge of Synchrony's mailing the credit card agreement to Chambers. As the trial court found, "Anderson does not testify she has any personal knowledge regarding the mailing of the arbitration agreement outside what the 'records show.' " As discussed, the contents of those records were hearsay, and Crown has not shown the trial court abused its discretion by finding the business record exception did not apply.

In its reply brief, for the first time, Crown contends "it is arguable that the [Anderson affidavit] was not proving the contents of a writing at all," and thus the secondary evidence rule did not apply. This contention appears to

contradict Crown's position in its opening brief.  And we generally do not consider arguments made for the first time on reply.  (See *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 692-693.)  Even if we were to consider it, we would conclude Crown had not shown error.  Crown is correct that the relevant issue is the fact of mailing, not what Synchrony's records show.  But Crown attempted to prove mailing by reference to Synchrony's records, rather than by testimony of a witness with personal knowledge of mailing. The admissibility of those records is therefore crucial.  (See *Pajaro Valley*, *supra*, 128 Cal.App.4th at pp. 1107-1108.)

Finally, in light of our conclusions, we need not consider whether the court erred by excluding Anderson's statements that she found no record of Chambers's objection to the arbitration agreement or its return as undeliverable.  Without a predicate showing that Chambers was mailed the arbitration agreement, these additional statements do not establish her consent.  We also need not consider the parties' dispute over Crown's standing to compel arbitration.

DISPOSITION

The order is affirmed.  Chambers is entitled to her costs on appeal.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

**CERTIFIED FOR PUBLICATION**


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PAMELA SHEREE CHAMBERS, | D079074 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 18CV338800) |
| CROWN ASSET MANAGEMENT, LLC, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |


THE COURT:

The opinion in this case filed October 21,2021, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the November 9, 2021 request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.


McCONNELL, P. J.

Copies to:  All parties